819 P.2d 110

**Dan WEAVER, d/b/a Dan Weaver Construction, Plaintiff–Counterdefendant–Respondent,**

v.

**David MILLARD, Crystal Springs Ranch, Inc., Crystal Springs Ranch, Ltd., Crystal Springs Warm–Water Aqua–Culture, David Millard Land Planning & Management, Defendants–Counterclaimants–Third Party Plaintiffs–Appellants,**

**and**

**Mark Lupher and Jody Lupher, husband and wife, Third Party Defendants–Respondents.**

No. 18272.

Court of Appeals of Idaho.

Sept. 27, 1991.

694

Hepworth, Nungester & Lezamiz, Twin Falls, for appellants. Jeffrey J. Hepworth argued.

Decker & Hollifield, Twin Falls, for respondents. Fred D. Decker argued.

SILAK, Judge.

This dispute arises from an oral contract between a contractor and a partnership for which the contractor constructed commercial fishponds for the partnership business. For the reasons stated below, we affirm the judgment of the district court in favor of the plaintiff contractor, including the order of the district court denying defendants' motion to disqualify counsel for plaintiff or to disqualify counsel for the third-party defendants. We also affirm the judgment of the district court awarding attorney fees to the third-party defendants.

The district court made the following findings of fact which are pertinent to this appeal. Appellant David Millard (Millard)

is a professional civil engineer with considerable experience in the economic analysis and construction of land development projects, including experience with concrete construction. Third-party defendant Mark Lupher (Lupher) managed a fish farm for another company, had his own ponds (the Harral ponds), and had raised catfish in Mississippi before coming to Idaho. Ken Corpron (Corpron) is a fishery specialist who approached Millard about growing catfish using the warm water well on the Millard Ranch located near Buhl, Idaho. Dave Diehl (Diehl) is a professional civil engineer. Roger Krupp (Krupp) is a concrete construction contractor. These men formed a partnership known as the Crystal Springs Warm–Water Aqua–Culture General Partnership (the partnership) for the purpose of raising catfish to be sold for processing.

On February 28, 1986, Lupher, Millard, and Corpron signed an agreement of understanding which set out the responsibilities of the parties and the purposes of the partnership. The agreement projected total costs of $130,800, including $27,000 for construction of the ponds with a $7,400 contingency. The agreement provided that Lupher and Corpron would receive a management fee for designing and managing the facility as well as for purchasing and marketing the fish. Lupher also contracted with the partnership to supply the fingerlings and then purchase the adult catfish for processing. Millard was to be responsible for water right acquisition, land, conveyance system design, and facility construction.

In June, 1986, a partnership agreement was executed incorporating the agreement of understanding and other agreements. Millard, the managing partner, delegated the authority for construction of the facility to Lupher. Although Millard gave Lupher a draft set of plans for the ponds, the design, site selection, and construction decisions were fully vested in Lupher. Lupher decided to use a different design.

On August 27, 1986, Lupher entered into an oral time-and-materials contract with respondent Dan Weaver, doing business as Dan Weaver Construction (collectively, Weaver), to build the concrete fishponds for the partnership. Weaver began construction shortly thereafter, and Lupher supervised the construction on a daily basis. On October 1, 1986, when the construction was partially complete, Weaver billed the partnership $21,233.07 for pond construction and an additional amount for moving some water lines. The partnership paid Weaver $22,392.27 on October 10, 1986.

At a partnership meeting on October 13, 1986, concern was expressed at the cost of the ponds. The partners viewed the site and agreed that construction would continue under Lupher's direction. Lupher, after a brief on-site consultation with Weaver, reported that the ponds were 75% complete and projected an additional expenditure of $8,000 to $10,000 to finish the project. No partner expressed any objection to the design, layout, or workmanship of the ponds at that time.

On November 1, 1986, Weaver billed the partnership $18,723.76, and Millard, approximately two days prior to completion of the construction, ordered Weaver to stop work on the project. The partnership did not pay Weaver's November bill. Weaver filed a materialman's lien on the property and, on December 17, 1986, filed this suit to foreclose the lien. On April 23, 1987, the partnership answered the complaint and counterclaimed, alleging that the work was not performed in a workmanlike manner. The partnership also filed a third-party complaint against Lupher alleging that Lupher breached the partnership agreement. Lupher responded to the third-party complaint on July 31, 1987. On September 8, 1988, the appellants moved to disqualify either counsel for Weaver or counsel for Lupher on the ground that Weaver and Lupher were represented by members of the same law firm. The district court denied the motion on October 12, 1988.

On October 31, 1988, the district court granted Lupher's motion for summary judgment and dismissed the partnership's third-party claim against him on the ground that, as a matter of law, the part-

nership could not maintain an action against Lupher other than an action to dissolve the partnership and for final accounting. The partnership has not appealed from the order granting the motion for summary judgment.

Millard and the partnership then filed another third-party complaint requesting dissolution of the partnership, I.C. § 53–332, and a final accounting, I.C. § 53–340, on the ground that Lupher's negligent supervision of the construction of the fishponds prejudicially affected the carrying on of the partnership business and/or made it not reasonably practicable to carry on the business in partnership with Lupher. The district court consolidated this third-party claim with the Weaver's action against the partnership.

The court conducted a six-day bench trial after which it entered its findings of fact and conclusions of law. The district court entered a $5,813.63 judgment for Weaver on the contract, but refused to foreclose the materialman's lien because Weaver's statement of demand failed to reflect deductions for just credits and offsets. *See* I.C. § 45–507. The court determined the amount of the judgment by deducting the following amounts from Weaver's November 1, 1986, bill to the partnership: $7,497 paid by the partnership directly to the concrete company which supplied the concrete for the ponds; $1,313.37 offset for labor overcharges; and $719.76 offset for concrete overcharges. The court further reduced the amount due Weaver by $3,380, the cost of repairs necessary to put the fishponds in operating order and required as a result of Weaver's poor workmanship.[1]

The court also denied the third-party claim against Lupher.

After additional proceedings to resolve the parties' disputes as to the proper amount and proper bases on which to award costs and attorney fees, the court ultimately entered judgment for Lupher against the partnership for costs and attorney fees pursuant to I.C. § 12–120(3) and I.R.C.P. 54(e). The court denied costs and attorney fees to Weaver, but allowed costs against Weaver to the partnership pursuant to I.R.C.P. 68.

### I. Attorney Disqualification

In district court, as in this appeal, the law firm of Decker and Hollifield represented both Weaver and Lupher; William R. Hollifield represented Weaver, and Fred Decker represented Lupher. The partnership moved, pursuant to Rules 1.7(b) and 1.10(a) of the Idaho Rules of Professional Conduct,[2] to disqualify either Decker or Hollifield. Unlike Rule 1.7(a), which deals with situations where the interests of multiple clients are directly adverse, Rule 1.7(b) deals with situations where an attorney's representation of one client "may be materially limited" by the attorney's representation of another client.

The partnership argues that the district court erred by denying its motion. The decision to grant or deny a motion to disqualify counsel is within the discretion of the trial court. *LaSalle National Bank v. County of Lake,* 703 F.2d 252, 256 (7th Cir.1983); *Golleher v. Horton,* 148 Ariz. 537, 715 P.2d 1225, 1235 (App.1985); *People v. Romero,* 767 P.2d 782, 784 (Colo.App.

---

1. The $3,380 included a $500 offset to repair rock pockets in the concrete, an $80 offset for straightening H-beams, and a $2,800 offset to repair the keyways.

2. Rule 1.7  Conflict of Interest: General Rule

   . . . .

   (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

   (1) the lawyer reasonably believes the representation will not be adversely affected; and

   (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implication of the common representation and the advantages and risks involved.

   Rule 1.10  Imputed Disqualification: General Rule

   (a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7, 1.8(c), 1.9 or 2.2.

1988); *Margulies v. Upchurch*, 696 P.2d 1195, 1200 (Utah 1985); *Marquardt v. Fein*, 25 Wash.App. 651, 612 P.2d 378, 382 (1980). On appeal from a discretionary decision of the court below, we conduct a three-tiered inquiry:

(1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason. [Citation omitted.]

*Sun Valley Shopping Center, Inc. v. Idaho Power Co.*, 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991); *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989).

■ The moving party has the burden of establishing grounds for the disqualification. *Alexander v. Superior Court*, 141 Ariz. 157, 685 P.2d 1309, 1313 (1984); *Woodard v. District Court*, 704 P.2d 851 (Colo.1985). The goal of the court should be to shape a remedy which will assure fairness to the parties and the integrity of the judicial process. *Romero*, 767 P.2d at 784. Whenever possible, courts should endeavor to reach a solution that is least burdensome to the client. *Alexander*, 685 P.2d at 1313.

As the district court noted, the preamble to the Idaho Rules of Professional Conduct ("I.R.P.C.") defines the scope of the Rules and provides that:

Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a

collateral proceeding or transaction has standing to seek enforcement of the Rule.

■ The district court also properly perceived that where, as here, the motion to disqualify comes not from a client or former client of the attorney, but from an opposing party, the motion should be viewed with caution. The comments to the Idaho Rules of Professional Conduct were based upon the comments to the American Bar Association Model Rules, but these comments have not been adopted by the Idaho Supreme Court. However, we note that the comment to I.R.P.C. 1.7 states:

Resolving questions of conflict of interest is primarily the responsibility of the lawyer undertaking the representation. In litigation, a court may [raise] the question when there is reason to infer that the lawyer has neglected the responsibility.... Where the conflict is such as clearly to call in question the fair or efficient administration of justice, opposing counsel may properly raise the question. Such an objection should be viewed with caution, however, for it can be misused as a technique for harassment.

■ At the hearing on the motion, counsel for the partnership argued that the possibility of tactical and/or substantive communications between Weaver and Lupher and their counsel created the potential for collusion, created a disadvantage for the partnership, and raised the appearance of impropriety. Counsel for Weaver and for Lupher advised the court that their clients consented, after the appropriate consultation, to the joint representation. Counsel for Weaver and Lupher also questioned the partnership's standing to raise the conflict of interest issue.

The district court had been given no indication that the motive for the partnership's motion was harassment. The court properly weighed the potential prejudice to the partnership against the interests of Weaver and Lupher. The district court applied a four-part test to determine whether an appearance of impropriety alone will give a

party standing to interfere with an adverse party's choice of counsel:

(1) whether the motion is being made for the purposes of harassing the defendant, (2) whether the party bringing the motion will be damaged in some way if the motion is not granted, (3) whether there are any alternative solutions, or is the proposed solution the least damaging possible under the circumstances, and (4) whether the possibility of public suspicion. will outweigh any benefits that might accrue due to continued representation.

*Alexander,* 685 P.2d at 1317.

The district court noted that factors one and four were not relevant to this case. In weighing factor two, whether the partnership would be prejudiced by continued representation of Weaver and Lupher by members of the same law firm, the district court considered the following:

A motion to disqualify opposing counsel should be filed at the onset of the litigation, or "with promptness and reasonable diligence once the facts" upon which the motion is based have become known. A failure to act promptly may warrant denial of the motion. (Footnotes omitted.)

*United Nuclear Corp. v. General Atomic Co.,* 96 N.M. 155, 629 P.2d 231, 320 (1980) *cert. denied,* 451 U.S. 901, 101 S.Ct. 1966, 68 L.Ed.2d 289 (1981); *see also First Small Business Inv. Co. of California v. Intercapital Corp. of Oregon,* 108 Wash.2d 324, 738 P.2d 263, 270 (1987) (motion to disqualify counsel properly denied on basis of waiver alone, where movants had reason to know of existence of basis for potential disqualification several years before filing the motion). The district court noted that Lupher, through the firm of Decker and Hollifield, filed his answer to the partnership's third-party complaint on July 31, 1987, and that the partnership did not move to disqualify Decker or Hollifield until September 8, 1988. Given that discovery was well underway and that motions for summary judgment were pending, the district court concluded that any possible prejudice to the partnership was far outweighed by

the possible prejudice to Weaver or Lupher of having to obtain new counsel if the motion were granted. The court also concluded that, in light of the relatively advanced nature of the proceedings, allowing Decker and Hollifield to continue their representation, while keeping their clients as separate as possible, was the least damaging alternative under the circumstances.

The district court properly perceived that it had the discretion to grant or deny the motion, acted within the boundaries of that discretion and consistently with the applicable legal standards, and reached its decision by an exercise of reason. Therefore, we conclude that the district court did not abuse its discretion in denying the partnership's motion either to disqualify counsel for Weaver or to disqualify counsel for Lupher.

## II. Factual Issues

■■■■■■■ The partnership argues that the trial court erred in its findings regarding Weaver's labor expenses, in finding that Weaver's work was performed in a workmanlike manner, and in finding that the partnership was responsible for one-half the cost of necessary repairs to keyways. The role of this Court in reviewing findings of fact is limited. We do not weigh the evidence, nor do we substitute our view of the facts for the view of the trial judge. *Angleton v. Angleton,* 84 Idaho 184, 198, 370 P.2d 788, 796 (1962); *Ortiz v. Dept. of Health & Welfare,* 113 Idaho 682, 683, 747 P.2d 91, 92 (Ct.App.1987). Findings cannot be deemed clearly erroneous if they are supported by substantial, even though conflicting, evidence in the record. *Sun Valley Shamrock v. Travelers Leasing,* 118 Idaho 116, 118, 794 P.2d 1389, 1391 (1990); *Ortiz,* 113 Idaho at 683–84, 747 P.2d at 92–3; *Rasmussen v. Martin,* 104 Idaho 401, 404, 659 P.2d 155, 158 (Ct.App.1983). Evidence is substantial if a reasonable trier of fact would accept and rely upon it in determining whether a disputed point of fact has been proven. *Ortiz,* 113 Idaho at 684, 747 P.2d at 93. This standard of review reflects the view that deference must be accorded to the trial court's special opportunity to assess and weigh the credibility of the

witnesses who appear before it. *State v. Tierney,* 109 Idaho 474, 476, 708 P.2d 879, 881 (1985); *Ortiz,* 113 Idaho at 684, 747 P.2d at 93; I.R.C.P. 52(a). In addition, the party challenging the findings has the burden of showing error, and this Court will review the evidence in the light most favorable to the prevailing party. *Rueth v. State,* 103 Idaho 74, 77, 644 P.2d 1333, 1336 (1982); *Martsch v. Nelson,* 109 Idaho 95, 100, 705 P.2d 1050, 1055 (Ct.App.1985). With these standards in mind, we examine each of the partnership's contentions of error.

### A. Labor Costs

■ The district court found that Lupher hired Weaver on an oral time-and-materials contract to be billed monthly at: $16 per hour for Weaver's time; $12 per hour for skilled labor; and $8 per hour for unskilled labor. Originally, the partnership was billed for all the labor at $11.75 per hour, resulting in an overcharge of $1,313.37, which the district court later offset against the judgment entered in favor of Weaver.

The partnership argues that the district court erred in finding that Weaver could recover damages for labor costs calculated at specific hourly rates, rather than recovering the amount he actually paid for labor. The partnership contends that Weaver failed to meet his burden of proving the amount of his labor costs with reasonable certainty. The partnership also contends that the hourly wage amounts were calculated to include the provision of worker's compensation coverage and the withholding income and social security taxes, which Weaver did not do.

The record indicates that in a spiral notebook Weaver kept track of the hours worked by some employees. Barbara Weaver, his wife and bookkeeper, transferred the information from the notebook to the computer she used for billings and payroll, and the spiral notebook was discarded. Mrs. Weaver testified that some of the workers were paid through a barter system. Weaver relied on those people to keep track of their own hours. Mrs. Weaver testified regarding the number of hours each person worked and which of the three hourly rates applied to each. In addition, the work on the ponds was observed by Lupher, who testified that he reviewed Weaver's bills and that the bills were in accordance with their agreement. The district court found that the work was performed substantially as Weaver claimed, notwithstanding the fact that some laborers were compensated by trading labor rather than wages. This finding is supported by substantial, competent evidence in the record.

### B. Quality of Weaver's Work

■ After judgment was entered in favor of Weaver, the partnership moved for reconsideration and requested the district court to make certain findings of fact as to (1) industry standards for building concrete fishponds and (2) additional repair costs. The court heard the parties' oral arguments on the motion, and granted the partnership an additional $500 offset for repairs. This amount is reflected in the amended judgment. The court orally denied that portion of the partnership's motion relating to industry standards, finding that the testimony and evidence presented at trial indicated that there existed no industry standards for the construction of concrete fishponds. On appeal, the partnership argues that the district court erred in finding Weaver's work was done in a workmanlike manner when the evidence shows: that there were industry standards for constructing concrete fishponds; that Weaver failed to construct the ponds in compliance with the industry standards; and that two of the pond walls must be replaced.

The trial transcript reveals conflicting testimony regarding the existence and applicability of industry standards. The expert witnesses disagreed about acceptable limits for the alignment of the pond walls and the amount by which the walls could be out of plumb. The experts generally agreed, however, that any applicable specifications are usually included in the contract or in the plans which are incorporated

into the contract, that different architects or engineers could set different standards, and that the quality of acceptable work is usually set by the owner of the property. The experts also generally agreed that, despite some defects, the ponds could be repaired and made usable within a matter of a few days. There was no evidence that any particular specifications were set forth in the instant contract.

There is substantial, although conflicting, evidence in the record to support the district court's finding that there were no industry standards for the construction of concrete fishponds. We note that, despite this finding on industry standards, the court did find that not all of Weaver's work was performed in a workmanlike manner. After deducting the partnership's direct payment to the concrete company, the concrete overcharge, and the labor overcharge, the remaining amount due on Weaver's November bill was $9,193.63. The court ultimately reduced that amount by $3,880 in offsets for necessary repairs attributable to Weaver's poor workmanship and entered judgment for Weaver in the amount of $5,313.63.

### C. Cost of the Keyway Repairs

■ The district court found that half the problem with the keyways resulted from poor design and that half the problem resulted from poor workmanship. The partnership argues that the district court erred in arbitrarily finding that Weaver should pay only half the $5,600 cost of repairing the keyways because all the testimony adduced at trial indicates that the design was functional, had the work been done properly.

There was testimony that there was nothing wrong with the design of the ponds, and, as discussed above, that the ponds would be usable if the necessary repairs were made to those portions of the ponds where the workmanship was poor. The experts also testified that the applicable specifications are usually included in the contract. Millard sent Lupher some design plans and structural calculations for the concrete which had been prepared by Diehl, but Lupher chose a different design. Weaver and Lupher discussed construction standards in general and agreed that the quality of the ponds should be the same as Lupher's Harral ponds which Weaver also built.

Lupher testified that the design of the partnership ponds was dependent upon the terrain at the site. The partnership originally planned to build eighteen ponds, but reduced the number to twelve when prohibitively large boulders were discovered on the site after the first six ponds had been built. After changing locations to accommodate the second set of six ponds, the partnership decided that fourteen ponds could be built. Weaver consulted with Lupher about the layout of the ponds as the design changed, and Lupher drew sketches of his plan. Weaver testified that he discussed the alignment problems with Lupher, and they decided to work around other large boulders rather than use dynamite to remove them. Reviewing this testimony in the light most favorable to Weaver, we conclude there is substantial evidence in this record to support the district court's finding that the cost of the keyway repairs should be divided between Weaver and the partnership.

### III. Dismissal of the Third–Party Complaint Against Lupher

The partnership's answer to Weaver's complaint included a third-party complaint against Lupher alleging that Lupher breached his fiduciary duty to the partnership. The district court granted Lupher's motion for summary judgment and dismissed the claim, finding that, as a matter of law, the partnership was entitled to maintain that claim against Lupher only in an action for dissolution of the partnership and final accounting which had not been pled. The partnership then moved for reconsideration, and the district court entered an order consolidating the contract action between Weaver and the partnership with the partnership's dissolution action against Lupher. The court further ordered that the partnership file an amended third-party complaint specifically setting forth its

claim for dissolution and accounting under the Uniform Partnership Law. *See* I.C. § 53–301, *et seq.*

Count I of the amended complaint alleged that, under I.C. § 53–321, Lupher breached his fiduciary duty to the partnership by: failing to exercise the requisite care in supervising construction of the fishponds; accepting defective work on the ponds; failing to negotiate a written contract or obtain a firm bid, or otherwise ensure that Weaver did not exceed the partnership's budget for pond construction; failing to hire a competent contractor; and failing to exercise care in the design of the ponds. Count II of the amended complaint alleged that Lupher's wrongful acts prejudicially affected the carrying on of the partnership business, and the partnership requested: a judicial dissolution of the partnership; a decree declaring the proportionate liabilities of each partner; and a judgment against Lupher for his proportionate share of the partnership's loss. I.C. §§ 53–332, 340.

The district court dismissed Count I of the amended third-party complaint during the bench trial. After the partnership, as third-party plaintiff, had rested its case, the court granted Lupher's motion to dismiss Count I because there was no evidence that Lupher violated the fiduciary duty defined in I.C. § 53–321. *See* I.R.C.P. 41(b). Following the bench trial, the district court denied the partnership's third-party claim against Lupher in all respects. The partnership contends that the trial court erred by denying its claim because Lupher failed to use his best efforts to negotiate a favorable contract on behalf of the partnership; failed to properly supervise construction of the fishponds; accepted defects in the workmanship which must be repaired; and was not aware of some of the defects.

### A. Dismissal of Count I

The appeal from a judgment based on an involuntary dismissal under I.R.C.P. 41(b) presents this Court with a mixed question of law and fact. *Staggie v. Idaho Falls Consol. Hospitals,* 110 Idaho 349, 351, 715 P.2d 1019, 1021 (Ct.App.1986).

We will uphold findings of fact which are not clearly erroneous, but we will review freely any statements of law and the court's conclusion that the facts as found did not entitle the partnership to any relief. *Id.*

Count I alleged that Lupher breached the fiduciary duty he owed to the partnership with regard to partnership affairs pursuant to I.C. § 53–321, which states in pertinent part:

> Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

The district court dismissed Count I because there "was no evidence that partnership profits had been retained and not accounted for by Mr. Lupher."

This finding is not clearly erroneous, and the district court did not err in concluding that the partnership was not entitled to relief under I.C. § 53–321. Millard testified that he had no evidence that Lupher had in his possession any funds or property belonging to the partnership or that Lupher acquired any benefit from the proceeds paid to Weaver other than the $10 per hour Weaver paid Lupher for the rental of Lupher's D4 Cat. Millard also testified that the claim against Lupher was not for misappropriating partnership money for personal use, but for exceeding the construction expenditure authority granted to him by the partnership.

### B. Count II

In dismissing Count II of the amended third-party complaint, the district court concluded that the partnership "utterly and completely failed to establish its claim against Lupher." We take this to mean that the partnership failed to meet its burden of proof, and our standard of review is the same "clearly erroneous" standard as that set out in I.R.C.P. 52(a) for findings of fact. *Viehweg v. Thompson,*

103 Idaho 265, 272, 647 P.2d 311, 318 (Ct. App.1982).

■ The district court made the following findings of fact relating to this issue. Lupher was authorized to act as managing partner for construction of the ponds in accordance with the terms and conditions of the partnership agreement. Some of Lupher's decisions regarding the ponds might not have been the best, but did not constitute a breach of Lupher's fiduciary duty to the partnership. Lupher's actions were completely covered by the business judgment rule, which was incorporated into the partnership agreement.

In addition, evidence adduced at trial tended to prove that the other members of the partnership had ratified Lupher's conduct. Millard saw Lupher's Harral ponds in late 1985 and early 1986 and noticed poor workmanship and spalling of the concrete, but did not tell Lupher this was not acceptable to him or to the partnership. Millard testified that he sent Lupher a draft set of plans for the ponds to critique and to change as he saw fit. Millard also authorized some of the modifications in the design of the ponds: moving the location of the second set of ponds due to the unexpected size of boulders in the original site; increasing the number of ponds from twelve to fourteen; and adding standpipes. At the time of the partnership meeting in October of 1986, several of the partners, all of whom had engineering and/or concrete construction experience, visited the site where the ponds were being built. After that meeting, Millard sent a memo to the other partners in which he said:

> *While the construction seemed adequate*, it was apparent that we were being billed "top dollar" for the work. It might be better for us if all future work be negotiated or bid prior to commencement so that we can budget accordingly. (Emphasis added.)

■ It is the province of the trial court to weigh the evidence, determine the inferences to be drawn from the evidence, and determine the credibility of witnesses. *Angleton v. Angleton,* 84 Idaho 184, 198, 370 P.2d 788, 796 (1962); *Tucek v. Huff,* 115 Idaho 905, 906, 771 P.2d 923, 924 (Ct.App. 1989); I.R.C.P. 52(a). There is substantial evidence in this record to support the findings of the district court. We hold that the district court's denial of the partnership's third-party claim against Lupher was not clearly erroneous.

### IV. Attorney Fees at Trial

The district court concluded that neither Weaver nor the partnership was entitled to attorney fees under I.C. § 12–120, because neither party prevailed. The district court awarded attorney fees to Lupher as a prevailing party, and entered a judgment against the partnership for Lupher's costs and fees. The partnership argues that the trial court erred in concluding that the partnership was not the prevailing party in the action filed by Weaver and in concluding that the partnership was not entitled to attorney fees as part of the costs allowed under I.R.C.P. 68, because I.C. § 12–120(3) allows attorney fees to be taxed and collected as costs.[3]

■ The identification of a prevailing party for the purpose of awarding attorney fees under I.C. § 12–120 rests in the discretion of the trial court. *Evans v. Sawtooth Partners,* 111 Idaho 381, 387, 723 P.2d 925, 931 (Ct.App.1986); *see Chadderdon v. King,* 104 Idaho 406, 659 P.2d 160 (Ct.App. 1983). In evaluating the district court's decision using the three-tiered inquiry, we first note that the district court recognized that it was within its discretion to determine who, if anyone, prevailed in this case. The district court then proceeded to discuss and apply each of the proper factors to identify the prevailing party: the result of the action in relation to the relief sought by the respective parties; whether there were multiple claims, multiple issues, counterclaims, third-party claims, cross-claims, etc.; and the extent to which each party prevailed upon each of those issues or

---

**3.** The partnership also argues that the award of attorney fees to Lupher was inequitable. Because we have affirmed the judgment of the district court, we need not consider whether the court erred in awarding attorney fees.

claims. *Jerry J. Joseph C.L.U. Ins. Assoc., Inc. v. Vaught,* 117 Idaho 555, 557, 789 P.2d 1146, 1148 (Ct.App.1990); *Chadderdon,* 104 Idaho at 411, 659 P.2d at 165; I.R.C.P. 54(d)(1)(B).

The district court concluded that Weaver and the partnership each prevailed on one of the two issues between them, but that each received far less than the respective relief they sought. The district court reached these conclusions through an exercise of reason, and the court did not abuse its discretion in concluding that neither Weaver nor the partnership prevailed against the other. Because we affirm the district court's determination that neither party prevailed, we need not address the argument that the partnership should have been awarded attorney fees as costs pursuant to I.C. § 12–120(3) and I.R.C.P. 68.

### V. Conclusion

The judgment of the district court is affirmed. Costs and attorney fees, pursuant to I.C. § 12–120(3), to respondents Weaver in an amount to be determined pursuant to I.A.R. 40 and 41. Costs to respondents Lupher in an amount to be determined pursuant to I.A.R. 40. We have considered Lupher's request for attorney fees on appeal, but decline to award them. *Minich v. Gem State Developers, Inc.,* 99 Idaho 911, 591 P.2d 1078 (1979).

WALTERS, C.J., and SWANSTROM, J., concur.