910 P.2d 786

**Wayne CROWN, Clark Bean, and Steve Bean, Plaintiffs–Appellants,**

v.

**HAWKINS CO., LTD., an Idaho corporation, and Jerry Hawkins, Robert Blass, as Directors of Hawkins Co., Ltd., William Nungester, as a Director of Hawkins Co., Ltd., Defendants–Respondents.**

No. 21283.

Court of Appeals of Idaho.

Jan. 2, 1996.

Petition for Review Denied Feb. 22, 1996.

Lloyd J. Walker, Twin Falls, and Lloyd W. Walker, Peachtree City, Georgia, for appellants. Lloyd W. Walker argued.

Hepworth, Lezamiz & Hohnhorst, Twin Falls, for respondents. John C. Hepworth argued.

WALTERS, Chief Judge.

Wayne Crown, Clark Bean and Steve Bean (the "Growers") appeal from a district court judgment which held that William Nungester did not breach any duties he owed as a director of the warehouse where the Growers deposited their beans, and that Nungester's actions were not the proximate cause of the Growers' injury. The Growers also challenge the district court's pretrial order denying their motion to disqualify Nungester's counsel because of an alleged conflict of interest. The court below determined that although Nungester was a member of the law firm and his name remained on the firm's title, the prejudice from excusing his counsel just prior to trial was so great that Nungester's counsel could remain and any potential ethical problems could be resolved upon consideration by the Idaho State Bar Association. For the reasons stated below, we affirm.

## I. FACTUAL BACKGROUND

Hawkins Co., Ltd. (the "warehouse") began business as a corporation in 1978. A warehouse that had existed prior to incorporation was purchased by Robert Blass, Jerry Hawkins and William Nungester, each of whom (along with their respective spouses) were issued one-third of the shares of stock in the corporation. The board of directors was composed of Blass, Hawkins and Nungester. Hawkins was president and general manager, and was in charge of operating the warehouse from the corporation's inception until the warehouse's closure. Blass and Nungester were not active in the day-to-day management of the warehouse.

During the operation of the warehouse, Nungester was an attorney practicing with the law firm of Hepworth, Nungester and Lezamiz.[1] Other than occasionally preparing the annual statement for filing with the Secretary of State, Nungester provided no legal services or legal representation for the warehouse. The warehouse was represented by the law firm of Hepworth, Nungester and Lezamiz on one occasion, but Nungester was not directly involved.

In addition to operating under the Bonded Warehouse Law, I.C. § 69–201 et seq., the warehouse acted as a broker in selling beans to third party wholesalers. Deposited beans remained in the ownership of the depositors until the beans were sold to the warehouse, at which point they became company-owned beans. The purchase of beans from the depositors throughout the period at issue was generally conducted by Hawkins. Hawkins had no authority to sell the beans without the depositors' approval.

From 1983 through 1988, the Growers delivered their bean crops to the warehouse. During this time the Idaho Department of Agriculture, Bureau of Warehouse Control

---

1. This law firm is now known as Hepworth, Lezamiz and Hohnhorst, Chartered.

(the "DOA") conducted annual inspections of the warehouse's physical contents and its financial records to ensure that the warehouse had sufficient inventory for its depositors. These inspections were always unannounced, unless specifically requested by the warehouse. Until November 22, 1988, the warehouse successfully passed all the DOA's inspections.

From 1978 through July 31, 1987, Tom Schabot, a certified public accountant, examined the warehouse's financial records and grower cards and physically inventoried all beans in the warehouse twice a year. On January 31 of each year, Schabot conducted his uncertified reviews, and at fiscal year-end on July 31, he performed the certified audits. Until July 31, 1987, all of Schabot's certified audits showed that the grower and financial records balanced and matched the physical inventory present in the warehouse.

By April 1987, the warehouse began experiencing a cash flow shortage. In August or September of the same year, First Security Bank discovered that Blass and Hawkins had established a check kiting scheme in an attempt to cover the warehouse's insufficient cash flow. Nungester first learned of these activities from First Security Bank who had discovered that approximately 2.2 million dollars in check kiting had occurred. Once informed, Nungester instructed both Blass and Hawkins to discontinue the practice, which they did. Nungester made no further inquiries, and he did not inform any authorities of the scheme.

From 1986 through 1988, Nungester made several checks payable to the warehouse for the purchase of beans, although he never actually took possession. Schabot noted this activity during his 1987 certified audit and recharacterized the purchases as loans by Nungester to the warehouse. Subsequent to these activities, additional loans were also made to the warehouse by various individuals including Nungester. These activities provided temporary cash flow to the warehouse.

Near the end of the summer in 1987, Jerre Hills was employed by the warehouse to replace, in part, Hawkins as a broker. Hills reviewed the Grower Lot Sheets. Every grower who had deposited beans with the warehouse had a sheet prepared for each variety of beans for the year that the beans were deposited. Entries on these sheets were made when the beans were weighed at the warehouse, after the beans were cleaned, and when the beans were sold. After reviewing the Grower Lot Sheets, Hills discovered that several of the sheets had printed on them negative balances which indicated that more beans were sold on that specific account than were on deposit at the warehouse. To cover these negative balances, Hawkins had altered the warehouse's copies of the Grower Lot Sheets so the books would balance. Upon seeing these balances, Hills went to Nungester's home and informed him of the situation. Nungester confronted Hawkins with this information and the explanations provided by Hawkins regarding the negative balances were to Nungester's satisfaction. Nungester did not investigate the matter further.

In 1988, several irregularities at the warehouse were discovered. Interim financial statements prepared by Schabot in January of 1988 revealed that the accounts receivable were large and were increasing. Hawkins had neither billed the accounts, nor had he charged any interest on them. In his audit letter, Schabot recommended to the board that these accounts be billed. In response, the board directed Hawkins to bill and collect the accounts receivable. The board was not aware, however, that Hawkins purposely failed to undertake collection of some of the accounts.

In May of 1988, Hawkins requested that the DOA inspect the warehouse. Prior to the inspection, Hawkins had several bean boxes filled with culls and dirt moved into the warehouse. David Sparrow, an inspector with the DOA, reviewed the warehouse records and counted the physical inventory. The inspection found a shortage of at least 6,475 sacks of pinto beans, which was explained by Hawkins to the DOA's satisfaction. The fact that many of the boxes contained culls and dirt was not discovered.

By September 18, 1988, Schabot had begun reviewing the warehouse's records again. He first contacted Nungester on September

29, 1988, to inform him that problems existed with the audit. Schabot told Nungester that he could not reconcile the physical inventory count with the warehouse's books. Schabot and Nungester met with Hawkins. Hawkins informed them that he could provide documentation to reconcile the shortage. While waiting for the documentation from Hawkins, neither Schabot nor Nungester investigated the matter further, and the warehouse continued to receive the 1988 bean crops. On or about November 14, 1988, Hawkins collapsed at the warehouse and was hospitalized at a mental health facility in Boise. The documentation to reconcile the shortages was never obtained.

On November 22, 1988, Nungester called the DOA because of the unreconcilable shortage. On the same day, the warehouse was placed under the supervision of the Idaho Bureau of Warehouse Control. It was determined that a shortage of 110,000 hundred weight of beans existed. The 1988 crop of 204,000 hundred weight remained at the warehouse upon its closure. The shortage was written off, and on January 6, 1989, Hawkins Co., Ltd., filed a Chapter 11 business reorganization plan pursuant to 11 U.S.C. § 101, *et seq.*

During this time, Nungester relied on the information provided to him from the DOA, Schabot and Hawkins regarding the accounts receivable, books and records, and cash shortages. He did not inspect the records himself nor did he personally go to the warehouse to review matters with the employees. Unbeknownst to Nungester, Hawkins had informed the employees not to discuss any business with Nungester and that, if Nungester made any inquiries, to direct him to speak to Hawkins.

## II. PROCEDURAL BACKGROUND

On December 1, 1988, this case was filed as a class action suit. The plaintiffs, representing approximately 180 bean growers, brought the action against the defendants for the bean shortage. The original action in this case was brought against Hawkins Co., Ltd.; the Idaho Department of Agriculture; Klein Brothers; and against the directors of the warehouse: Blass, Hawkins and Nungester.

All of the defendants but Nungester were dismissed. Hawkins Co., Ltd., filed a petition in bankruptcy and, pursuant to a stipulation, was dismissed from this suit on November 7, 1990. On November 13, 1990, the DOA was dismissed from the action because the Growers had failed to comply with the Idaho Torts Claims Act's requirement that they first present their claim to the governmental defendant. The Growers subsequently filed a negligence action against the DOA based on the DOA's failure to discover and disclose low inventories in the warehouse. The district court granted summary judgment in favor of the DOA. However, on appeal, the Supreme Court reversed in part, holding that whether the DOA inspector acted negligently presented a question of fact precluding summary judgment as it related to the loss of bean inventory prior to the effective date of new legislation which insulated the DOA from liability. *Crown v. State,* 127 Idaho 175, 179, 898 P.2d 1086, 1090 (1995). The district court entered summary judgment on behalf of Klein Bros. Ltd. and issued an I.R.C.P. Rule 54(b) certificate so the Growers could take an interlocutory appeal. On that appeal, this Court affirmed the district court's summary judgment order. *Crown v. Klein Bros.,* 121 Idaho 942, 829 P.2d 532 (Ct.App.1991). Blass filed a Chapter 11 bankruptcy and was discharged by the bankruptcy court. On July 13, 1992, the action against Blass in this case was dismissed. Hawkins also filed bankruptcy and was discharged.

The claim against the remaining defendant, Nungester, is based on the theory of negligence, brought by the Growers pursuant to the Bonded Warehouse Law. The complaint centered on the duty, if any, that Nungester, as a director of the warehouse, owed to the Growers; whether Nungester breached that duty; and whether the breach was the proximate cause of the Growers' injury. Upon stipulation of the parties, the liability and damage issues were bifurcated. The issue of damage was to be tried at a later date.

With regard to the liability issue, the district court held, after a bench trial, that Nungester was not negligent in his duties as a director. The Growers have appealed from the judgment and the court's dismissal of the Growers' pretrial motion requesting disqualification of Nungester's counsel.

## III. STANDARD OF REVIEW

 When a trial court sits without a jury and issues specific findings of fact, our review of the court's findings of fact is limited. We will not set aside the lower court's findings of fact unless they are clearly erroneous. I.R.C.P. 52(a); *Schiewe v. Farwell,* 125 Idaho 46, 50-1, 867 P.2d 920, 925-26 (1993); *Christensen v. Nelson,* 125 Idaho 663, 665, 873 P.2d 917, 919 (Ct.App.1994). We do not weigh the evidence, nor do we substitute our view of the facts for the view of the trial judge. *Christensen,* 125 Idaho at 665, 873 P.2d at 919. We defer especially to the district court's opportunity to judge the credibility of witnesses appearing personally before it. *Id.* Where findings made by the trial court are challenged on appeal, the evidence must be considered most favorably toward the respondent and against the appellant. *McCoy v. McCoy,* 125 Idaho 199, 202, 868 P.2d 527, 530 (Ct.App.1994).

## IV. DISCUSSION

### A. Sufficiency of the Evidence.

At the outset, the Growers argue that the district court erred by finding credible the testimonies of Schabot and Sparrow. The Growers contend that the court relied heavily on the fact that Schabot, a certified accountant, was unable to detect the consequences of Hawkins' behavior. They submit that the court's finding assumes Schabot's testimony was truthful regarding the audits he performed when in fact the evidence shows otherwise.

The Growers claim that Schabot was not the independent fact witness he held himself out to be at trial because Schabot's "testimony was carefully prepared by defendant's trial counsel," a fact which the Growers assert they did not learn about until two months after the trial. They also argue that

"[n]either the trial court nor plaintiff's counsel [were] aware [that] this witness was testifying as an advocate on behalf of Nungester." The Growers support these allegations by stating that Schabot could not have counted the physical inventory as testified, because if he had, he would have discovered the shortage. They assert that Schabot conformed his testimony to opposing counsel's theories because to do otherwise would be to admit that he performed his audits negligently. Finally, the Growers argue that Schabot's pretrial interview with Nungester's counsel and counsel's payment of $660 to Schabot for the interview were inappropriate.

 It is well established that the trial court possesses the unique opportunity to assess the credibility of the witnesses appearing before it. *Viebrock v. Gill,* 125 Idaho 948, 951, 877 P.2d 919, 922 (1994). An appellate court cannot substitute its opinion of witness credibility for that of the trier of fact. *Savage Lat. Ditch Water Users Assoc. v. Pulley,* 125 Idaho 237, 242, 869 P.2d 554, 559 (1994). The party challenging the findings has the burden of showing error, and this Court will review the evidence in the light most favorable to the prevailing party. *McCoy, supra.*

 The Growers have not provided this Court with any facts from the record upon which to support their arguments that Schabot's testimony should not have been accepted by the district court as credible. Substantial evidence exists to support the court's findings that: (1) Schabot conducted two audits per year—one certified and one uncertified—during which he reviewed all financial books and grower records and physically inventoried the beans in the warehouse; (2) prior to 1988, Schabot's audits showed that the warehouse's books and records balanced with the physical inventory on hand; and (3) Schabot's audits revealed no shortage of beans prior to 1988. We conclude that the Growers' have not met their burden in challenging these findings.

Furthermore, the Growers accuse Nungester's counsel of preparing Schabot's testimony and assert that neither the trial court nor the Growers' counsel were aware that Scha-

bot would be testifying for Nungester. Again, we find these allegations to be without merit. The record is clear that Schabot was called as a witness by the Growers' counsel and was cross-examined by opposing counsel. Schabot's testimony recounted his audit procedures and findings. There is nothing in the record to show that Schabot's testimony was anything but an independent, candid account of his audit activities of the warehouse. Again, we hold that the Growers have not met their burden of proof.

■ Finally, the Growers claim that the pretrial meeting between Schabot and Nungester's counsel and the payment of $660 for Schabot's time were inappropriate. We find no merit to these arguments. Schabot was a participant and eyewitness to events underlying the litigation. He was not a retained expert hired by the Growers, nor was he an employee of the Growers. Under the circumstances, there was no impropriety in the meeting between Schabot and Nungester's attorneys. Out-of-court interviews with an adverse party's witnesses may be conducted confidentially, without the presence of opposing counsel, whenever the witness interviewed is willing to proceed in such a manner. *I.B.M. Corp. v. Edelstein*, 526 F.2d 37, 44 (2nd Cir.1975). Such interviews are allowed because a legitimate need exists for confidentiality in these interviews in order to promote the goals of maximizing unhampered access to information and insuring the presentation of the best possible case at trial. *Id.* at 42. There is nothing in the record indicating that Schabot opposed the pretrial interview. It is also a legal and common practice to compensate witnesses for their time away from work and travel expenses for pretrial interviews, depositions and trial testimonies.

■ The Growers also assert that the district court should not have found Sparrow's testimony credible because if Sparrow had conducted the physical inventory as testified, he too would have discovered a significant variation between the actual inventory and the total on the daily position record. This argument suggests that Hawkins would not have been able to explain away the shortage.

Sparrow testified that he discovered an inventory shortage of 6,475 sacks of pinto beans in May of 1988, and that this discrepancy was explained to his satisfaction by Hawkins. Hawkins told Sparrow that the shortage was caused by beans being removed and treated for use as seed. According to the standards set forth by the Bureau of Warehouse Control, seed beans could not be included as part of the physical inventory count. After discussing the shortage with Patrice Hamilton, the warehouse employee in charge of maintaining the warehouse's books, and reviewing with her the individual ledger cards, Sparrow was informed of nothing which raised his suspicions. Again, we conclude that the Growers have not met their burden.

After reviewing the record, we conclude that the district court had before it all of the above information in finding both Schabot's and Sparrow's testimonies credible. We hold that the court's findings regarding these two testimonies are supported by substantial evidence.

## B. Director's Duties Pursuant to I.C. § 30-1-35.

■ Decisions of the Idaho Supreme Court establish that the directors of a warehouse corporation may be personally liable to depositors for losses caused by the directors' negligence. *Smith v. Great Basin Grain Co.*, 98 Idaho 266, 561 P.2d 1299 (1977); *Frontier Milling & Elevator Co. v. Roy White Co-operative Mercantile Co.*, 25 Idaho 478, 138 P. 825 (1914).

The Growers argue that the district court erred in finding that Nungester conducted his duties as a director in a reasonable and prudent manner under the circumstances and, thus did not act negligently. A director's fiduciary duties are provided, in pertinent part, by Idaho Code § 30-1-35 as follows:

A director shall perform his duties as a director, ... in good faith, in a manner he reasonably believes to be in the best interests of the corporation, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. In performing his duties, a

director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by:

(a) One (1) or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented,

(b) Counsel, public accountants or other persons as to matters which the director reasonably believes to be within such person's professional or expert competence. . . .

■ The question whether Nungester's actions constituted proper performance of his duties as a director pursuant to I.C. § 30–1–35 is a question of fact, which must be determined in each case in view of all of the circumstances. *Frontier Milling & Elevator Co. v. Roy White Co–Operative Mercantile Co.*, 25 Idaho 478, 490, 138 P. 825, 829 (1914).

■ The Growers assert that pursuant to Section 30–1–35, the term "duties" includes independent duties, which means that once a director has been placed on inquiry notice, he or she must investigate the issues, and cannot rely solely on reports, inspections and information provided by certain experts once such notice has arisen. The Growers submit that if Nungester had adequately investigated the problems which arose, Hawkins' acts would have been stopped and the Growers' losses would have been significantly less if not altogether eliminated. The Growers maintain that Nungester's failure to perform these duties was the proximate cause of their injury.

The Growers argue that Nungester received notice that the warehouse was experiencing problems on several occasions. These occasions included the following points in time: (1) from September 1986 through September 1987, when Nungester infused over $300,000 dollars in the warehouse to provide additional cash flow; (2) during the summer of 1987, when Blass and Hawkins were caught kiting checks for over 2.2 million dollars to improve the warehouse's liquidity; and (3) during September 1987, when Hills discovered negative balances on the Grower

Lot Sheets and informed Nungester of the problem. The Growers contend that Nungester's actions in response to these notices were insufficient. Rather than relying on Hawkins' explanations and assurances, the Growers submit that Nungester should have reviewed documents other than those prepared by Schabot and the DOA, that he should have discussed the issues with warehouse employees and that he should have followed up to ensure that the auditor's recommendations were being implemented.

Nungester responds that, as a director, he had the right to rely on the audits and inspection reports as allowed by I.C. § 30–1–35 because each were prepared by qualified experts. He states that from 1978 through July 31, 1987, none of the reports or inspections revealed any commodity shortages nor did they uncover any irregularities in the warehouse's bookkeeping methods. Nungester argues that if the accountants could not uncover any shortages, he surely would not have been able to discover them given his lack of expertise in accounting. Nungester further claims that once problems were brought to his attention, he addressed them. For example, when Hills discovered the negative balances, Nungester and the DOA inspector discussed the issue with Hawkins. Hawkins provided an explanation which the auditors found reasonable. Furthermore, Nungester testified that once he became aware of the check kiting scheme, he requested a meeting between Hawkins, a bank officer with First Security Bank and himself, during which he instructed Hawkins to stop all check kiting activities. Hawkins agreed, and no additional problems were experienced by the warehouse with regard to that activity.

As a director, Nungester, attended directors' meetings, reviewed financial statements and assisted in the formation of the warehouse's policies. He did not possess any specific skills in the day-to-day operation of the warehouse or in the brokeraging of commodities. Hawkins, who did have experience in the bean business, was retained by the directors to be president and manager in charge of the warehouse's day-to-day operations. As a director with no specific skills in

this industry, Nungester relied upon the information provided to him by Hawkins and the opinions, reports, and inspections of Schabot and the DOA.

Based upon this evidence, the district court found that Nungester performed his duties as a director in good faith and in a manner he reasonably believed was in the best interest of the warehouse. The court concluded that Nungester used such care as an ordinary prudent person in a like position would use under similar circumstances. Further, having found that Nungester was not negligent and did not breach any duty owed to the Growers, the district court concluded that none of Nungester's actions proximately caused or contributed to any damage suffered by the Growers. The district court's findings are based upon substantial evidence and are not clearly erroneous. I.R.C.P. 52(a). Because we uphold the district court's findings and conclusions on the question of the lack of negligence, we need not address the Grower's arguments on the issue of proximate cause.

■ Next, the Growers argue that as a lawyer, Nungester should be held to a higher standard of care as a director than I.C. § 30–1–35 requires. Nungester's actions, they submit, should be compared to that of an "ordinary prudent person in a like position." The Growers contend that the phrase "like position" means that if a director is a lawyer, that director is obligated to use his or her lawyering skills in the performance of the directorship.

We disagree. The fact that Nungester was a lawyer during his directorship does not increase, change or otherwise modify the duty he owed to the warehouse.

## C. Pretrial Motion to Disqualify Nungester's Counsel.

In a pretrial motion, the Growers requested that the district court disqualify John Hepworth, John Lezamiz and the law firm of Hepworth, Nungester and Lezamiz as counsel for Nungester. The district court determined that ethical violations may exist because Nungester was no longer a member of the law firm but that his name remained in the firm's title. However, the court held that the prejudice to Nungester of removing his counsel three weeks before the trial date outweighed any potential ethical violation. The court deferred to the Idaho State Bar to take any actions it deemed necessary to resolve the alleged ethical violations.

The Growers argue that Nungester's counsel should have been disqualified because a conflict of interest existed between Nungester and Hepworth, Lezamiz and the law firm. The Growers assert that if Nungester's actions as a director were found to be negligent, the assets of the law firm and its partners would be implicated. They submit that such a direct, personal stake in the outcome of this litigation violates Rule 1.7(b) of the Idaho Rules of Professional Conduct. Rule 1.7(b) provides in pertinent part:

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. . . .

The Growers submit that because this alleged conflict existed, the court should have automatically disqualified Nungester's counsel, even if Nungester consented to the representation.

■ The decision to grant or to deny a motion to disqualify counsel is within the discretion of the trial court. *Weaver v. Millard*, 120 Idaho 692, 696, 819 P.2d 110, 114 (Ct.App.1991). On appeal from a discretionary decision of the trial court, we conduct a three-tiered inquiry: (1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason. *Id.* at 697, 819 P.2d at 115.

■ The moving party has the burden of establishing grounds for the disqualifica-

tion. *Id.* The goal of the court should be to shape a remedy which will assure fairness to the parties and the integrity of the judicial process. *Id.* Whenever possible, courts should endeavor to reach a solution that is least burdensome to the client. *Id.* Where the motion to disqualify comes not from a client or former client of the attorney, but from an opposing party, the motion should be reviewed with caution. *Id.* The court must also consider that a motion to disqualify opposing counsel should be filed at the onset of the litigation, or "with promptness and reasonable diligence" once the facts upon which the motion is based have become known. *Id.* at 698, 819 P.2d at 116. A failure to act promptly may warrant denial of the motion. *Id.*

■ The district court correctly perceived the issue of disqualifying Nungester's counsel as one calling for the exercise of the court's discretion. The district court properly weighed the prejudice to Nungester of disqualifying his counsel at such a late date against the alleged financial interests of Hepworth, Lezamiz and the law firm of Hepworth, Nungester and Lezamiz in the outcome of the case. During its deliberations, the court had available to it the record which shows that this case was filed on December 1, 1988, and that Nungester had been continuously represented by Hepworth, Lezamiz and their law firm. The record also shows that the Growers filed the pretrial motion to disqualify on November 18, 1993, subsequent to the order scheduling the bench trial to begin on January 11, 1994. It appears the court also took into consideration the fact that the Growers did not act with promptness and reasonable diligence in filing the motion.

We conclude that the district court acted within the boundaries of its discretion, consistently with the legal standards applicable to the choices available to it, and that its decision was reached by an exercise of reason. Accordingly, we hold that the district court did not abuse its discretion by denying the Growers' pretrial motion to disqualify opposing counsel.

## V. ATTORNEY FEES ON APPEAL

■ The respondent has requested an award of attorney fees on appeal under Idaho Code § 12–121 and under I.A.R. 11.1. Although the respondent is the prevailing party, we conclude that such an award would be inappropriate under Section 12–121. *See Minich v. Gem State Developers, Inc.,* 99 Idaho 911, 591 P.2d 1078 (1979). Also, because this appeal involved good faith arguments concerning conflicting evidence to support the findings entered by the district court with regard to a director's liability under I.C. § 30–1–35, no attorney fees on appeal are awarded under Rule 11.1, I.A.R.

## CONCLUSION

For the reasons stated, we affirm the district court's judgment and its denial of the pretrial motion to disqualify Nungester's counsel. Costs, but not attorney fees, are awarded to respondent, Nungester.

LANSING and PERRY, JJ., concur.