842 P.2d 299

**Franklin B. EDWARDS, Plaintiff–Appellant,**

v.

**Roger EDWARDS, William D. Mitchell (formerly William D. Edwards,) Dawn Neumann, Alexandra Christina Edwards, Margot Elizabeth Edwards, and William D. Mitchell, personal representative of the estate of Ora A. Edwards, deceased, Defendants–Respondents.**

**Roger EDWARDS, William D. Mitchell (formerly William D. Edwards,) Dawn Neumann, and William D. Mitchell personal representative of the estate of Ora A. Edwards, deceased, Counterclaimants–Respondents,**

v.

**Franklin B. EDWARDS, Counterdefendant–Appellant.**

No. 19504.

Court of Appeals of Idaho.

Oct. 1, 1992.

Petition for Review Denied Dec. 30, 1992.

Manweiler, Bevis & Cameron, Boise, for appellant Franklin B. Edwards. Diane M. Tappen argued.

Cosho, Humphrey, Greener & Welsh, Boise, for respondent Roger Edwards. Robert W. Talboy argued.

Killen & Kerrick, McCall, for respondents Alexandra C. and Margo E. Edwards. William M. Killen argued.

WALTERS, Chief Judge.

This is a family dispute involving two agreements to develop real property located in the vicinity of the Cascade Reservoir. Franklin Edwards (Frank), a real estate developer, brought this action against his children and the estate of his deceased mother, seeking a declaratory ruling on the enforceability of a 1964 joint venture agreement and a 1977 contract to develop property held in trust. Following a trial, the district court decreed the joint venture dissolved as a result of Frank's wrongful conduct, and further held the subsequent contract voidable as a consequence of Frank's breach of his duty as trustee. We affirm.

### Facts and Procedural Background

Charles and Ora Edwards had one child, Frank. In 1937, Charles and Ora bought 1,350 acres of land near Donnelly, in Valley County. The federal government purchased the land in 1940 as part of the development of the Cascade Dam and Reservoir. After the dam was completed, the government deeded part of the land back to Charles and Ora, which they thereafter held as community property. The area soon began developing into a location for summer homes, enhancing the economic potential of the Edwards' property. In 1964, Charles, Ora, and Frank entered into an agreement (the 1964 Agreement) to develop a portion of the land known as the Edwards Ranch Subdivisions I and II. Under the terms of the agreement, Charles and Ora agreed to make these two tracts available for promotion and sale, and Frank agreed to make the improvements necessary to develop the property, to promote and sell individual lots, and to oversee the performance of sales contracts. Specifically, the agreement recited that Frank promised to

> proceed with plans to develop the ... property for purposes of its sale, to construct the necessary roads, ditches and other improvements necessary for the development of the area, and to promote and sell the lots in the two subdivisions. He further agrees to be responsible for the sale of the lots.

The parties also agreed that Frank would receive one-half the net profit from each lot sold, and that the parties would share expenses equally. The agreement further provided that it was to remain in effect until all the lots were sold, and that its terms would be binding on the parties' administrators, executors, and heirs.

Between 1964 and 1974, Frank sold all of the lots in the Edwards Ranch Subdivision I, and all but eleven of the lots in Edwards Ranch Subdivision II. Frank purchased a waterfront lot in Subdivision II for himself where he built his home. The eleven unsold lots lie immediately adjacent to his home, shielding it from some of the other development in the area.

In March, 1974, Charles Edwards died. With a few exceptions not germane to this case, Charles left his entire estate, which included his one-half interest in his and Ora's real property, in trust for the benefit of Ora and his four then-living grandchildren—Frank's four older children: William, Roger, Dawn, and Alexandra, and named Frank as its trustee.[1] Pursuant to the

---

1. The will expressly omitted to provide for, or to make any gift or bequest to, Frank, stating that

Frank had received significant lifetime gifts of

terms of the testamentary trust (the Trust), Ora received a life interest in the trust income, and upon her death the trust corpus was to be divided among the four grandchildren. The document authorized the trustee to invade the trust corpus as necessary to provide for Ora's support, maintenance and health. Charles' will additionally contained the following request:

Although I am not directing the Trustee not to sell this property [the land adjacent to the reservoir], I urge that he retain it as long as possible for the reason that it will continue to appreciate in value.

With the single exception of an offer in 1989—which precipitated this litigation and is discussed below—Frank made no attempt to sell any of the remaining lots in Subdivision II after 1974.

During 1976 and 1977, Frank and Ora discussed developing and selling other property to fund the Trust, notwithstanding the fact that there remained unsold lots in the Edwards Ranch Subdivision II. In April, 1977, Frank and Ora entered into a written contract (the 1977 Agreement) to develop and sell lots from a twenty-five acre tract within the original Edwards property, known as the Margot Subdivision. Ora and the Trust each owned an undivided one-half interest in this property. Under the terms of the 1977 Agreement, Frank would receive fifty percent of the net profit from each sale, the Trust twenty-five percent, and Ora twenty-five percent. Frank executed the agreement in his individual capacity, and also as trustee on behalf of the beneficiaries.

Ora died in July, 1988, terminating the trust. The trust corpus, which included a one-half interest in the eleven unsold lots in the Edwards Ranch Subdivision II and a one-half interest in the unsold lots remaining in the Margot Subdivision, was distributed directly to the four named grandchildren. In her will, Ora named William, the eldest grandchild, the personal representative of her estate. Over Frank's objection,[2] the will was admitted to probate.

Shortly after Ora's death, Frank learned that, in 1986, Ora had executed and recorded a document unilaterally renouncing the 1964 Agreement and declaring it to be of no further effect. In November, 1989, while the will contest was pending, Rufus and Rona Gillette offered to buy two of the remaining lots in the Edwards Subdivision II, plus a small additional parcel outside of the subdivision, for $100,000. Frank was willing to make the sale, but when he asked William to proceed with the transaction on behalf of Ora's estate, William refused. The family dispute has also prevented the completion of other proposed sales in the Margot Subdivision.

In February, 1990, Frank filed this action against his children and Ora's estate, seeking a declaration that the 1964 and 1977 agreements were valid and binding upon all of them, and that Ora's unilateral renunciation of the earlier agreement was without effect. The three eldest children, William, Roger and Dawn, filed an answer and counterclaim. They admitted that the 1977 Agreement was still valid and enforceable. They alleged, however, that the 1986 renunciation was a valid exercise of Ora's rights, and asked the court to declare the 1964 agreement no longer in effect.[3] Alexandra Edwards filed a separate answer alleging that Frank executed the 1977 Agreement in violation of his duties as trustee, rendering the agreement voidable, at least as to her interest.

Without ruling on the validity or effect of Ora's unilateral renunciation of the 1964 Agreement, the court concluded that the joint venture had been dissolved, prior to

property and Frank therefore was able to provide for himself.

**2.** Two years before her death, Ora Edwards executed a codicil to her 1979 will, expressly omitting any provisions for her son, Frank, and leaving her entire estate to her grandchildren, including Margot Edwards, who was born after Charles' death.

**3.** These three children also counterclaimed for damages, alleging that Frank had breached his fiduciary and contractual duties under the 1964 Agreement. The district court denied this claim, finding that no damages had been established. This ruling has not been challenged on appeal.

the time of the renunciation in 1986, because Frank had willfully and persistently breached his duty to promote and sell the remaining lots under the Agreement. In ruling on the enforceability of the 1977 Agreement, the court concluded that, notwithstanding Frank's good faith or the fairness of the agreement's terms, Frank's dual role as trustee and developer created an impermissible conflict of interest, and absent Alexandra's consent or authorization by a court, the agreement was voidable as to her interest.[4]

On appeal, Frank asserts that the district court erred by finding that his conduct constituted a willful breach of his duties under the 1964 Agreement, and therefore the decree of dissolution must be reversed. He also avers that the court erroneously held he had breached his fiduciary duty to Alexandra, and that its declaration that the 1977 Agreement was voidable as to her interest must also be overturned. We will address these issues in turn.

### Standard of Review

■ The role of this Court in reviewing findings of fact is limited. We do not weigh the evidence, nor do we substitute our view of the facts for that of the fact finder. *Alumet v. Bear Lake Grazing Co.*, 119 Idaho 946, 949, 812 P.2d 253, 256 (1991). Findings made by the trier of fact will not be disturbed on appeal unless clearly erroneous. I.R.C.P. 52(a). Findings are not clearly erroneous if they are supported by substantial, even though conflicting, evidence in the record. *Sun Valley Shamrock v. Travelers Leasing*, 118 Idaho 116, 118, 794 P.2d 1389, 1391 (1990). Evidence

is "substantial" if a reasonable trier of fact would accept and rely upon it in determining whether a disputed point of fact has been proved. *Weaver v. Millard*, 120 Idaho 692, 698, 819 P.2d 110, 116 (Ct.App. 1991). However, we freely review any statements of law and the trial court's application of the law to the facts properly found. *Carr v. Carr*, 116 Idaho 747, 750, 779 P.2d 422, 425 (Ct.App.1989).

### Dissolution of the Joint Venture

■ A joint venture is a relationship analogous to, but not identical with, a partnership. *Brummett v. Ediger*, 106 Idaho 724, 727, 682 P.2d 1271, 1274 (1984); *Stearns v. Williams*, 72 Idaho 276, 284–85, 240 P.2d 833, 839 (1952). Accordingly, the law relating to the dissolution and termination of partnerships generally applies to joint ventures. *See* 46 AM.JUR.2D *Joint Ventures* § 30, at 51 (1969). The Uniform Partnership Act, as adopted in Idaho, enumerates the legal causes of dissolution. *See* I.C. § 53–331.[5] Section 53–331(6) provides for dissolution by decree of a court. The grounds upon which a party is entitled to a judicial decree of dissolution are set forth in I.C. § 53–332. Specifically, the court will decree a dissolution whenever

> a partner wilfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him.

I.C. § 53–332(1)(a).

■ Frank does not contest the applicability of the Uniform Partnership Act to

---

4. Although the court determined Alexandra and Margot had prevailed in the action, it concluded that they were not entitled to attorney fees under I.C. § 12–120(3). Alexandra and Margot filed a separate appeal from the order denying their request for fees. Our decision in that appeal may be found at 122 Idaho 971, 842 P.2d 307 (App.1992).

5. Parties to an agreement may expressly provide that upon the happening of certain events otherwise working a dissolution by operation of law, *e.g.*, the death of a partner, the partnership will continue and dissolution and winding up is not required. Nevertheless, as recognized by I.C.

§ 53–331(2), each partner has the power to dissolve the partnership at any time and for any reason, even though the dissolution is contrary to the specific provisions of the partnership contract. In short, no one can be forced to continue a partnership against his or her will.

A distinction must be recognized, however, between the *power* to dissolve a partnership and the *right* to dissolve it. If a partner exercises his power to dissolve a partnership, without the corresponding right to do so, he or she will be held liable for breach of contract. *See* 59A AM.JUR.2D, *Partnership* §§ 818, 819 and 822 (1987); *see also* 46 AM.JUR.2D *Joint Ventures* § 49, at 67–69 (1969).

the issues presented. Rather, his appeal challenges the district court's finding that he "willfully and persistently breached his duties under the 1964 agreement to the extent it became totally impracticable to carry on the purpose of the joint adventure—to develop and sell the remaining lots in Edwards Subdivision II." Frank maintains that the court's ultimate finding of a willful and persistent breach is premised on two underlying erroneous findings: (1) that during the fifteen-year period between 1974 and 1989, Frank did nothing to promote or sell the eleven remaining lots under the 1964 Agreement; and (2) that Frank intended to use the lots for his own benefit. He claims that the first finding is clearly erroneous in light of evidence that he staked lots, graded a road, and orally listed the lots with realtors in the area. However, it does not appear from the record that these efforts to improve and promote the lots took place after 1974. Furthermore, the record indicates that Frank failed to establish any road to some of the lots as required by the original plat. The record also indicates that two realtors with whom Frank had listed other Edwards properties did not know that the lots adjacent to Frank's home were for sale. According to Frank's own testimony, the eleven remaining lots were not advertised after 1974. Frank also argues that septic tank restrictions imposed in 1970 and 1972 impeded the further sale of lots in the Edwards Ranch Subdivision II. Notwithstanding the imposition of the sewage covenants, however, Frank was able to purchase for himself a lot in that subdivision, and to sell another lot in 1974, and to attempt to sell the two lots to the Gillettes in 1989.

Frank argues that his inactivity was justified because it furthered the parties' profit motive and his father's will that he "retain the property as long as possible for the reason that it will continue to appreciate in value." Admittedly, the property had increased in value. However, the trial judge considered Frank's explanation and the evidence supporting it, but ultimately rejected it, being persuaded that "the most reasonable and rational explanation for Frank's lack of effort on behalf of the joint adventure is that he intended to use the lots for his own benefit, to provide a buffer zone between his own house and other residences." This finding is supported by evidence of Frank's active development of other Edwards property around the reservoir, most notably, the lots in the Margot Subdivision. As Frank acknowledges, the provision in his father's will applied to *all* of the Edwards property near the reservoir, including lots in the Margot Subdivision. Furthermore, the evidence indicates that Frank proposed the development of the Margot Subdivision in 1977 after telling his mother there were no more lots left to sell, even though the eleven lots next to his own home remained unsold. The district court also heard testimony from Frank's former wife, who had lived with him at Edwards Ranch Subdivision II from the time their house was built in 1972 until 1988. According to her, Frank was not inclined to develop the surrounding lots and he told her he wanted to preserve his privacy from neighbors.

We conclude that the record contains ample evidence, even if conflicting, to support the district court's finding that Frank's fifteen years' inaction under the 1964 Agreement constituted a willful and persistent breach of his duties. Accordingly, the district court's declaration that the joint venture was dissolved as a result of Frank's conduct is affirmed.

▆▆▆ As a final note on the subject, we mention that the effective date of a dissolution is the date of the first effective act of dissolution; subsequent acts or causes of dissolution are irrelevant. *See* 59A AM.JUR.2D *Partnership* § 814, at 638 (1987). Thus, although a dissolution by judicial decree generally dates from the date of the court decree, the date of dissolution may be deemed to have occurred earlier, where, as here, the partnership is dissolved on the basis of findings that relate back to a prior date. 59A AM.JUR.2D *Partnership* §§ 881–883, at 670–71. In view of the court's finding that Frank's willful and persistent breach predated Ora's 1986 renunciation, the renunciation

was a superfluous act, and a ruling on its validity or effect was unnecessary.

### The 1977 Agreement

 Next, we turn to the declaration that the 1977 Agreement was voidable as to Alexandra. Frank seeks to overturn this decision, arguing that the court erroneously held that his execution of the agreement violated his fiduciary duty of loyalty. As noted above, Frank contracted to develop the Margot Subdivision—property owned jointly by Ora Edwards and the Trust. Under the terms of the agreement he was to receive fifty percent of the net profit from all sales. Frank entered into the agreement on his own behalf and also as trustee on behalf of the Trust's beneficiaries. Alexandra Edwards, a beneficiary of the Trust and still a minor in 1977, never consented to the agreement at the time of its making, nor has she ratified it subsequently. These facts are not disputed.

Although Frank acknowledges that his dual role as trustee and developer generally would create a conflict of interest, he argues that under the circumstances, the fact that he placed himself in a position of potentially conflicting loyalties did not constitute a breach of his fiduciary duty to the beneficiaries. We disagree.

The Uniform Trustees' Powers Act, I.C. §§ 68–104 through 68–113, describes the powers that may be exercised by a trustee. The Act specifically recognizes the trustee's powers to invest the trust assets and to develop, improve and convey them. *See* I.C. § 68–106(c). However, these powers are expressly made subject to the trustee's duty to act with due regard to his or her obligation as a fiduciary. I.C. § 68–106(b). Although the obligations of a fiduciary are not enumerated in the statute, they are well established in the law. Often deemed its first duty, the trustee owes a duty of loyalty.

The trustee owes a duty to the beneficiary to administer the trust in the interest of the beneficiaries alone, and to exclude from consideration his own advantages and the welfare of third persons. This duty is called the duty of loyalty.

If the trustee engages in a disloyal transaction, the beneficiary may secure the aid of equity in avoiding the act of the trustee or obtaining other appropriate relief, *regardless of the good faith of the trustee or the effect of the trustee's conduct on the beneficiary or benefit to the trustee.*

In enforcing the duty of loyalty the court is primarily interested in improving trust administration by deterring trustees from getting into positions of conflict of interests, and only secondarily in preventing loss to particular beneficiaries or unjust enrichment of the trustee.

G.G. BOGERT & G.T. BOGERT, LAW OF TRUSTS § 95 (5th ed. 1973) (emphasis added); *see also* RESTATEMENT (SECOND) OF TRUSTS §§ 170, 206 (1959); A. SCOTT, ABRIDGMENT OF THE LAW OF TRUSTS § 170 (1960). "Fidelity in the agent is what is aimed at, and as a means of securing it the law will not permit the agent to place himself in a situation in which he may be tempted by his own private interest to disregard that of his principal." *Jensen v. Sidney Stevens Implement Co.*, 36 Idaho 348, 353, 210 P. 1003, 1005 (1922). Furthermore, the Uniform Trustees' Powers Act specifically provides that if the fiduciary duty of the trustee and his individual interest conflict in the exercise of a trust power, the power may be exercised *only* by court authorization. I.C. § 68–108(b).[6]

By contracting to develop and sell the trust property at a profit to himself, Frank clearly was not acting for the sole benefit of the trust beneficiaries, but for his own interest as well, therefore creating a conflict of interest. Pursuant to the provisions of the Trustees' Powers Act, I.C. § 68–108(b), Frank was prohibited from entering into the contract without court authorization. Although Frank admits he

---

6. The statute enumerates several limited exceptions pertaining to the retention of trust assets, the acquisition of an undivided interest in a trust asset, the deposit of trust funds in a bank, borrowing money on behalf of the trust, the employment of persons to assist with the duties of administration. However, none of these exceptions are relevant to this case.

never obtained judicial authorization, he suggests that the conflict of interest created here ought to be exempted from his duty of loyalty, arguing that his actions were in accord with the presumptive intent of his father, the trust settlor, to develop and sell the properties in order to fund the trust corpus. To support his position, Frank relies on two cases, *In re Kellogg's Trust*, 35 Misc.2d 541, 230 N.Y.S.2d 836 (1962) and *In re Steele's Estate*, 377 Pa. 250, 103 A.2d 409 (1954). These cases lend little support, however, because they present situations in which the trustee's conflict of interest was either passive or was the direct creation of the trust settlor. Here, by contrast, Frank himself created the conflict by contracting to develop the trust property at a profit to himself. Although the trust scheme arguably countenanced the development of the trust properties, their development by way of a specific arrangement involving self-dealing was neither inherent in the trust scheme nor authorized by the trust instrument. Thus, even if otherwise applicable in this jurisdiction, the reasoning of the cases cited by Frank is inapposite to the factual situation here.

As correctly concluded by the district court, Frank executed the 1977 Agreement in violation of his duties as trustee. Because Alexandra had neither consented to the agreement at the time nor ratified it since, she was entitled to equitable relief. The judgment declaring the 1977 Agreement voidable as to her interest is, therefore, affirmed.

### Attorney Fees on Appeal

■ Because the respondents have prevailed in this appeal, they are entitled to an award of costs to be determined under I.A.R. 40. They have also requested an award of attorney fees under I.C. § 12-121. A request for attorney fees under section 12-121 will not be granted on appeal where the losing party brought the appeal in good faith and where a genuine issue of law was presented. However, attorney fees will be awarded when this Court is left with the abiding belief that the appeal was brought, pursued or defended frivolously, unreasonably, or without foundation. I.R.C.P. 54(e)(1); *Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 918, 591 P.2d 1078, 1085 (1979).

> Where the appellant fails to present any significant issue on appeal regarding a question of law, where no findings or fact made by the trial court are clearly or arguably unsupported by substantial evidence, where we are not asked to establish any new legal standards or modify existing ones, and where the focus of the case is on the application of settled law to the facts, the appeal is deemed to be without foundation. Under those circumstances, attorney fees should be awarded to the respondent. *Excel Leasing Co. v. Christensen*, 115 Idaho 708, 712, 769 P.2d 585, 589 (Ct.App.1989).

*Troche v. Gier*, 118 Idaho 740, 742, 800 P.2d 136, 138 (Ct.App.1990).

Frank's appeal challenged the decree dissolving the 1964 joint venture on grounds of insufficient evidence. As our discussion of that issue makes clear, the record contains ample evidence to support the court's finding that Frank willfully and persistently breached his duties under the agreement. Frank's argument merely invited this Court to second-guess the trial court on conflicting evidence. Frank also questioned the court's conclusion that the conflict of interest created by the self-dealing arrangement under the 1977 contract constituted a breach of his duty as trustee. The law in this area is well settled. Moreover, I.C. § 68-108(b) strictly prohibited Frank from entering into the contract as trustee without obtaining court authorization. Although Frank urged that we recognize an exception in his case—a position also advanced to and rejected by the trial court—his argument was not supported by the authority cited. For these reasons, we are left with the abiding belief that the appeal was brought frivolously, unreasonably, and without foundation. We therefore award attorney fees to the respondents in an amount to be determined under I.A.R. 41.

## CONCLUSION

The judgment of the district court declaring the 1964 joint venture dissolved and the 1977 agreement voidable as to Alexandra is affirmed. Costs and attorney fees on appeal to respondents, the Edwards children and Ora Edwards' estate.

SWANSTROM and SILAK, JJ., concur.