**In re Patrick W. REILLY, Betty–Ann D. Reilly, Debtors.**

**Bankruptcy No. 96–20102.**

United States Bankruptcy Court,
D. Connecticut.

June 14, 1999.

Patrick W. Boatman, Boatman, Boscarino, Grasso and Twachtman, Glastonbury, CT, for trustee, Anthony S. Novak.

Martin W. Hoffman, Hank D. Hoffman, and Walter J. Onacewicz, Law Offices of Martin W. Hoffman, West Hartford, CT, for James W. Sherman, creditor.

Joel M. Grafstein, Grafstein & Associates, Farmington, CT, for debtors.

*RULING ON TRUSTEE'S OBJECTION TO PROOF OF CLAIM FILED BY JAMES W. SHERMAN, ESQ., A CREDITOR*

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

## I.

### ISSUES

The matter before the court is the objection of Anthony S. Novak, Esq., the Chapter 7 Trustee ("the trustee") of the Joint Estate of Patrick W. Reilly ("the debtor") and Betty–Ann D. Reilly, the debtor's wife ("the co-debtor"), to an amended proof of claim filed by James W. Sherman, Esq. ("Sherman")[1]. Sherman asserts he is entitled to $327,500, or one-fourth of the amount which the debtor and the trustee received postpetition from a Roman Catholic religious order known as the Missionaries of Our Lady of LaSalette ("the Order"). Sherman contends that his entitlement to such sum arises out of an alleged joint venture he entered into with the debtor and two others. The trustee in his objection[2] and post-hearing memorandum (1) denies that Sherman and the debtor were ever in a joint venture, but argues that, if one had been established, it necessarily terminated prepetition; (2) asserts that Sherman's claim is barred under the Connecticut Statute of Frauds; and (3) argues that Sherman, as an attorney, was ethically precluded from entering into a joint venture with the debtor, an existing client. After four days of hearings, Sherman and the trustee submitted their memoranda of law with proposed findings of fact.

## II.

### BACKGROUND

The Order for many decades owned a tract of land in Ipswich, Massachusetts comprising some 320 acres ("the property"). There were a number of buildings on the property including a main mansion building, a dormitory, camp buildings for boys and a church which served as a shrine. Due to serious financial problems associated with the upkeep of the property, the Order, in 1991, formed a five-person task force ("the task force") to study methods of utilizing the property to create additional revenues. Father James H. Kuczynski ("Father Kuczynski") was a member and chairperson of the task force.

The Order's Provincial (chief administrator) between 1988 and 1997 was Father Thomas A. Reilly ("Father Reilly"), the debtor's brother. The Reilly children, during their youth, were brought up in the Town of Enfield, Connecticut. Also brought up in Enfield during the same period were three Tyler brothers—Thomas J. Tyler ("Thomas Tyler"), Russell J. Tyler ("Russell Tyler") (or, together with Thomas, "the two Tylers") and John E. Tyler, Jr. ("John Tyler"). The Reilly brothers and the Tyler brothers were friends during these years.

Thomas Tyler and Russell Tyler became lawyers and practiced in Enfield under the firm name of Tyler & Tyler. The debtor became a real estate developer and builder, and retained Tyler & Tyler as his lawyers. The Tyler firm, in addition, had major financial involvement in many, if not all, of the debtor's real estate subdivision projects.

Sometime in late 1986 or early 1987, Sherman, a local attorney specializing in a real estate practice, attended a meeting at the Tyler & Tyler law office where he first met the debtor with the two Tylers present. Sherman contends that an oral joint venture was then entered into concerning the Order's property. Sherman testified:

---

1. The claim originally was asserted against both the debtor and the co-debtor, but Sherman withdrew the claim as to the co-debtor at the start of the hearings.

2. Fed.R.Bankr.P. 3007 provides, in pertinent part: "An objection to the allowance of a claim shall be in writing and filed...."

"We talked about working together, the four of us, that would be Pat Reilly, myself, Tom Tyler and Russ Tyler, in liquidating that property, either through a sale or a purchase by us." (Tr. at 171.) Sherman stated that there was discussion about how the debtor had previously been involved in disposing of other Order realty. Sherman stated that no written agreement was then, or ever, drafted to indicate the duration, terms, obligations or purpose of the venture, although he testified that at various times during the next six or seven years, until October 1993, he worked on proposals for the property, spoke with local Ipswich officials and viewed the property and other realty in that area.

In March 1991 and in early 1993, Tyler & Tyler drafted two real estate purchase agreements for the property with potential buyers respectively known as Bernard Buonanno and Ipswich Partners Ltd. (Ex. J; Ex. K.) Although the record is unclear under what circumstances or whether these proposals were presented to the Order, it is undisputed that neither purchase agreement went anywhere.

In June 1993, the three Tyler brothers, the debtor, Father Reilly, Father Kuczynski and two other members of the Order met for dinner in Connecticut. Although the purpose of the dinner was social, Father Reilly discussed with those present the financial problems that the Order was experiencing with the property. Following the dinner Thomas Tyler wrote a letter, dated July 3, 1993, to Father Reilly offering John Tyler's financial expertise to market the "excess" acreage of the property, with the Order retaining the "prime" parcel (the shrine). (Ex. 4.) Father Reilly responded with a letter dated July 6, 1993, addressed to John Tyler, then residing in Kansas City, stating the Order would be interested in proposals concerning the future of the property's excess acreage. (Ex. 5.) Father Reilly later met with John Tyler once, but nothing came of that meeting.

In late July 1993, according to Sherman, the debtor and the two Tylers had a serious disaccord, with the two Tylers, *inter alia,* accusing Reilly of "absconding" or "stealing" money from their joint real estate subdivision projects. (Tr. at 230, 369.) As part of an effort to work out their differences, the debtor, on or about August 13, 1993, executed a deed to Sherman, as trustee for the two Tylers, of a 30–acre subdivision, located in Enfield. (Ex. 18.) Reilly also executed a promissory note payable to the two Tylers for $764,470.38, (Ex. 15), which they assigned to Sherman as their trustee. The two Tylers further assigned to Sherman, as trustee, a mortgage deed secured by a summer house in Narragansett, Rhode Island owned by the debtor and the co-debtor. (Ex. 15.)

Sherman, on September 24, 1993, travelled to Ipswich to present a proposal to the task force. He returned on October 14, 1993 with further proposal details. He suggested to the task force that the Order form a joint venture to develop the property for residential homes and that one-third of the profits go to the Order, one-third to an unknown investor and one-third be divided among Sherman, the debtor, Thomas Tyler, Russell Tyler and John Tyler, should he choose to participate. The task force's reaction to Sherman's proposal was "unanimously negative." (Tr. at 227.) Sherman had no further contact with the task force after January 4, 1994, when he was notified by Father Kuczynski that the Order was not ready to consider selling or developing the property. On or about September 28, 1993, Sherman spoke to the debtor who advised Sherman that he would not be "partners with Russ and Tom" with respect to any proposal Sherman had made to the task force. (Ex. N.) Sherman thereafter wrote two letters to the debtor, dated October 19 and 27, 1993, respectively, in which he decried the breakup with the two Tylers. (Ex. 7; Ex. O.) Sherman added in the October 27th letter: "If there is anything that I can help you with in moving the Ipswich project forward, please call." (Ex. O.)

The differences between the debtor and the two Tylers, and Sherman as the Tylers' trustee, quickly escalated. Sherman, as trustee, on September 15, 1993, on instructions from the two Tylers, had recorded the deed from the debtor to himself for the 30–acre parcel, and, on October 25, 1993, Sherman conveyed the parcel to a third person for the benefit of the Tylers. The two Tylers started a proceeding in early 1994 in Rhode Island to foreclose the mortgage on the debtor's and co-debtor's Rhode Island property.

The debtor and the co-debtor, by complaint dated April 11, 1994, sued the two Tylers and Sherman, as trustee, in Rhode Island seeking to stop the foreclosure, alleging, *inter alia*, that the two Tylers and Sherman wrongfully recorded the deed conveying the 30–acre tract to Sherman, trustee; that through "fraud and deceit" the two Tylers induced the debtor to sign promissory notes, including one for $764,470.38; that the two Tylers and Sherman, trustee, "fraudulently induced" the debtor and co-debtor to sign the Rhode Island mortgage. (Ex. P.)

Sherman, on June 15, 1994, filed an answer and counterclaim to this complaint. In the counterclaim Sherman alleged the debtor in "late summer / early fall of 1993 ... unilaterally terminated" a joint venture to build and sell homes "for a profit" in Ipswich, Massachusetts; that such termination constituted a breach of contract; that the debtor "through fraud and deceit" acted to deprive Sherman of his share of the profits in the joint venture; that the debtor tortiously interfered with Sherman's relationship with the owner of the Ipswich property and that the debtor breached his fiduciary duty to Sherman. (Ex. Q.)

On June 17, 1994, the debtor and the co-debtor brought a complaint in Connecticut against the two Tylers and Sherman, making similar, but not identical, charges as in the Rhode Island action. (Ex. V.)

In the meantime, the Order's task force continued to pursue proposals for the property. In June 1994, the task force decided to pursue a proposal to sell the excess acreage for use as a continuing-care retirement community to one Dr. Alfred L. Arcidi (Arcidi). Father Reilly had called upon the debtor as an unpaid consultant to the Order for advice concerning the Arcidi proposal. On April 10, 1995, the Order and Arcidi jointly executed a document entitled "Offer to Purchase" in which Arcidi offered to ·purchase the excess acreage for $3,000,000 under certain conditions. (Ex. 2.) Arcidi never exercised his rights under the Offer to Purchase.

Following the demise of the Arcidi proposal, the Order's task force contacted the debtor for advice and assistance in selling the entire property, not just the excess acreage. On August 1, 1995 the Order and the debtor entered into an agreement entitled "Agreement To Purchase" in which the debtor, doing business as Aequus Enterprises, was granted, in effect, a one-year option to purchase the property for $3,200,000. (Ex. 3.) These parties did not believe that the debtor would actually exercise the option to buy the property for his own account, but would use the option to look for a buyer of the property with the debtor's compensation being any amount in excess of $3,200,000. During the year following the execution of the Agreement To Purchase, the debtor did not exercise the option. He continued, however, after August 1, 1996, to look for buyers, and sometime prior to June 2, 1997, he located an entity which did purchase the property. Father Kuczynski testified that the debtor was responsible for facilitating the sale by curing serious water and sewer problems which plagued the property. On June 2, 1997, the Order sold the property to Turner Hill Preservation Associates LLC for $4,511,000. (Ex. G.) Father Kuczynski testified that the Order, despite the expiration of the Agreement To Purchase granted to the debtor on August 1, 1995, decided, in effect, to honor it by paying to the debtor $1,311,000. Father Kuczynski stated the reason

for paying such money to the debtor was "the services that he rendered to the community in the purchase and preparing the property for the purchase," and that, "we felt we didn't have any obligation legally, but we felt that it was the proper thing to do." (Tr. at 33.)

The debtor and co-debtor filed a joint Chapter 11 petition in this court on January 16, 1996. The court converted the case to one under Chapter 7 on January 21, 1997. On Schedule G of the original petition, the debtor listed as an existing executory contract "Option to purchase real estate in Ipswich, Mass. 312 acres for 3.2 Million." (Ex. E.) Following the sale of the property on June 2, 1997, this court, on the trustee's complaint, entered an injunction requiring that payments which the debtor was receiving from the Order be placed in escrow, less certain authorized disbursements, with the trustee. (Ex. H.) A ruling on the issue of whether the debtor or his estate is entitled to the monies has been put off, at the request of the parties, pending the conclusion of hearings on the trustee's objections to claims, including Sherman's claim. Although at various times during the hearing Sherman's counsel stated that Thomas Tyler would be testifying on Sherman's behalf, Sherman never called Thomas Tyler to present any evidence.

The debtor testified that he had never entered into an oral joint venture with Sherman. He contended that the only partnerships he had entered into were those with the two Tylers involving subdivision developments. He conceded that he viewed the Order's property with Sherman and the two Tylers in 1988, at a time when the property was not on the market.

In light of the court's conclusions on the issue of the existence of a joint venture after October, 1993, it is unnecessary, for reasons of judicial economy, to set forth the complicated factual background re-

quired to understand the trustee's claim concerning Sherman's actions, if any, as an attorney for the debtor. Nor is it necessary to address the trustee's further defense of the application of the Connecticut Statute of Frauds.

## III.

### *DISCUSSION*

#### A.

 Sherman's properly executed and filed proof of claim, as amended, constituted prima facie evidence of the validity and amount of his claim, thereby initially shifting the burden of going forward to the trustee. *See* Fed.R.Bankr.P. 3001(f).[3] When the debtor testified that he had not entered into an oral joint venture with Sherman and that Sherman was not entitled to recover on his claim, such evidence constituted sufficient evidence to overcome the presumption of validity. In addition, both Father Kuczynski and Father Reilly denied any knowledge of a joint venture between Sherman and the debtor. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir.1992). ("In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. The burden of persuasion is always on the claimant.") (citations omitted). The court concludes that Sherman has the burden of proving by a preponderance of the evidence, the continuing existence, validity and terms of the joint venture which he claims entitles him to one-fourth of the $1,311,000 received by the debtor's estate from the Order following the sale of the property.

---

**3.** Rule 3001(f) provides:

(f) Evidentiary Effect. A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim. Fed.R.Bank.P. 3001(f).

## B.

Connecticut decisional law concerning joint ventures is not extensive. Connecticut courts define a joint venture as "a special combination of two or more persons who combine their property, money, effects, skill, and knowledge to seek a profit jointly in a single business enterprise without any actual partnership or corporate designation." *Electronic Associates, Inc. v. Automatic Equipment Development Corporation*, 185 Conn. 31, 35, 440 A.2d 249 (1981). "The relations and obligations in a joint venture are generally governed by the principles of common-law partnership." *Travis v. St. John*, 176 Conn. 69, 73, 404 A.2d 885 (1978). In *Lesser v. Smith*, 115 Conn. 86, 160 A. 302 (1932), the plaintiff sought damages from the defendant alleging an oral joint venture between them for the investment of monies in the stock market. The trial court's judgment for the defendant denying the plaintiff's request for damages was upheld by the supreme court with the court noting that "[w]here men enter into a loose verbal arrangement [for a joint venture], ... the result is what might be fairly expected." *Id.* at 91, 160 A. 302. In *Dolan v. Dolan*, 107 Conn. 342, 350, 140 A. 745 (1928), the court ruled that a joint fund established by a husband and wife constituted a joint enterprise or adventure, and when, later, these parties had disagreements and separated, "[t]heir disagreement and separation which has now taken place render it impracticable to continue the relation, and it is of a sufficiently serious nature to justify a court of equity in decreeing a dissolution and a division of the fund." The court further noted that although "the distinction between a partnership and a joint adventure is often very slight ... there is not the relation of principal and agent in joint adventure which we find in a partnership." *Id.* at 349, 140 A. 745.

## C.

The court concludes that the debtor entered into a joint venture with Sherman and the two Tylers in 1986 or 1987. The various activities described herein that those parties engaged in concerning the property between 1987 and 1993 cannot be reasonably accounted for in any other way. The court, however, despite Sherman's claim that the joint venture was for an indeterminate period, concludes that he has not carried his burden of proof that the debtor so agreed, and Sherman failed to produce as witnesses either of the two Tylers who might have substantiated Sherman's assertion. In any event, Sherman concedes that the joint venture terminated at some point prior to the filing of his counterclaim, on June 15, 1994, in the Rhode Island action commenced by the debtor against him and the two Tylers.

On September 28, 1993, the debtor specifically advised Sherman of the debtor's withdrawal from the joint venture. Sherman's letter to the debtor of October 27, 1993 can be construed as an acceptance by Sherman that, as a joint venture including the debtor, the Ipswich project was at an end.

More significantly, starting in the fall of 1993 until the debtor filed his bankruptcy petition on January 16, 1996, the original four parties to the joint venture were engaged in especially acrimonious lawsuits in which the debtor on one side, and the two Tylers and Sherman on the other, were accusing each other of fraud and deceit and the taking of actions inimical to the best interests of the other. With that state of affairs, the court determines that the four parties to the joint venture terminated their relationship as a joint venture by June 1994, and at a time when there were no joint profits, assets or rights to divide. *Cf. Dolan v. Dolan, supra; Edwards v. Edwards*, 122 Idaho 963, 842 P.2d 299, 304 (1992) ("although a dissolution by judicial decree [of a partnership] generally dates from the date of the court decree, the date of dissolution may be deemed to have occurred earlier, where, as here, the partnership is dissolved on the basis of

findings, that relate back to a prior date"); 59A *Am.Jur.2d* Partnership § 881 (1987) ("A judicial dissolution generally dates from the court decree of dissolution, although the date of dissolution may be deemed to have occurred earlier than the date a judicial decree of dissolution is entered, where the equities warrant, or where the partnership is dissolved on the basis of findings that relate back to a prior date. The court has wide discretion in fixing the date when the dissolution takes effect").

The court fully credits the testimony of Father Kuczynski, that the Sherman proposal in October, 1993 was rejected with no further involvement between Sherman and the task force; that it was not until almost a year-and-a-half later, in April, 1995, that the Order decided to sell the excess acreage to Arcidi, and almost two years later, in August 1995, that the Order determined to enter into the Agreement to Purchase with the debtor. The sale to the eventual buyer of the property did not occur until June, 1997, some three-and-one-half years after the breakup of the joint venture. Sherman presented no evidence of any tortious interference by the debtor of a business relationship between Sherman and the Order. The court finds that the arrangement between the Order and the debtor in August, 1995 did not come about as a result of the activities of the joint venture during its existence. The court thus concludes that, as Sherman has failed to carry his burden of proof of the validity of his amended claim. the trustee's objection to the amended claim will be sustained and the claim denied.

## IV.

### *CONCLUSION*

Sherman claims that the debtor, he and the two Tylers orally agreed to a joint venture concerning the Order's property. Only he so testified; the debtor denied it; and neither of the Tylers testified. The court, nonetheless, has concluded, for the reasons stated, that there was some sort of loose joint venture that started in 1987 and ended in the fall of 1993. At that point, Sherman, the debtor and the Tylers had a devastating falling out to the extent that they accused each other of fraud, deceit and theft of funds. For the next three years, these parties were engaged in unremitting litigation. Only the debtor, after 1993, performed any services for the Order, such that the Order, in 1997, compensated him for his own account.

The court is satisfied, and so concludes, that Sherman has not carried his burden of proof of the validity of his amended claim. Accordingly, the trustee's objection to such claim must be, and hereby is sustained and the claim is denied. It is

**SO ORDERED.**