245 B.R. 768 (2000)
In re Patrick W. REILLY Betty-Ann D. Reilly, Debtors.
James W. Sherman, Appellant,
v.
Anthony S. Novak, Trustee, Appellee.
BAP No. 99-50064. Bankruptcy No. 96-20102.
United States Bankruptcy Appellate Panel of the Second Circuit.
Argued November 19, 1999.
Decided March 8, 2000.
*769 *770 Law Offices of Martin W. Hoffman, Martin W. Hoffman, West Hartford, CT, for Appellant.
Boatman, Boscarino, Grasso & Twachtman, Patrick W. Boatman, Glastonbury, CT, for Trustee, Anthony Novak.
Before Hon. JOHN C. NINFO, II, Hon. JEFFRY H. GALLET & Hon. ROBERT E. LITTLEFIELD, Jr., Bankruptcy Judges.

OPINION
LITTLEFIELD, Bankruptcy Judge.
This appeal is from the June 14, 1999 ruling of Judge Robert L. Krechevsky, United States Bankruptcy Judge, District of Connecticut on the Trustee's Objection To Proof of Claim Filed By James W. Sherman, Esq., a creditor. This ruling sustained the trustee's (hereinafter "Appellee") objection to the amended claim of James W. Sherman (hereinafter "Appellant") and denied said claim, concluding that the Appellant had not carried the burden of proof of the validity of his claim. For the reasons set forth below we AFFIRM the Bankruptcy Court's determination.

FACTS
The facts based upon the pleadings and found by the Bankruptcy Court in its decision of June 14, 1999, are as follows:
*771 In 1987, Patrick W. Riley (hereinafter "Debtor"), Thomas Tyler and Russell Tyler (hereinafter the "Tylers") and the Appellant entered into a loose arrangement whereby they would develop and sell various parcels of real estate. All of the parties except the Debtor were licensed attorneys, however, there was no written agreement with respect to this arrangement.
In 1991, a Roman Catholic religious order known as the Missionaries of Our Lady of LaSalette (hereinafter "the Order") formed a five person task force to study methods for utilizing a tract of land which the Order owned in Ipswich, Massachusetts. The Order's chief administrator between 1988 and 1997 was Father Thomas A. Reilly, the Debtor's brother.
On two occasions, in March 1991 and early 1993, the Tylers drafted proposed real estate purchase agreements for the property with potential buyers. However, neither of these agreements culminated in a sale of the subject property.
In June 1993, the Tylers, the Debtor, Father Reilly and Father Kuczynski (chairperson for the task force) met for a social dinner. Over dinner, the land was discussed. On July 3, 1993, Thomas Tyler wrote a letter to Father Reilly offering his assistance in marketing the property. On July 6, 1993, Father Reilly responded that the Order would be interested in proposals concerning the property's non-developed acreage. A meeting occurred between Father Reilly and Thomas Tyler but no agreement of any type resulted.
In late July 1993, the Debtor and the Tylers had a bitter disagreement with the Tylers accusing the Debtor of stealing money. On or about August 13, 1993, in an attempt to work out these differences, the Debtor executed a deed for a 30-acre parcel of land to the Appellant, as trustee, for the Tylers. The Debtor also executed a promissory note payable to the Tylers for $764,470.38. This note was assigned to the Appellant as trustee for the Tylers. In addition, the Tylers assigned to the Appellant, as trustee, a mortgage deed secured by the Debtor's summer home. On September 15, 1993, the Appellant, acting upon instructions from the Tylers, recorded the deed from the Debtor to himself.
On or about September 28, 1993, the Debtor advised the Appellant that he "would not be partners with Russ and Tom." In re Reilly, 235 B.R. 239, 241 (Bankr.D.Conn.1999) The Appellant then wrote two letters expressing his dismay at the termination of the relationship. On October 25, 1993, the Appellant conveyed the 30-acre parcel to a third person for the benefit of the Tylers.
Additionally, in the fall of 1993, the Appellant presented a proposal to the task force suggesting that the Order form a joint venture to develop the property. The task force's reaction was "unanimously negative." Id. The Appellant had no further contact with the task force after January 4, 1994, when he was notified by Father Kuczynski that the Order was not ready to consider selling or developing the property.
In early 1994, the Tylers started a proceeding to foreclose on the mortgage of the Debtor's Rhode Island property. On April 11, 1994, the Debtor initiated a Rhode Island state court action against the Tylers and the Appellant, as trustee, seeking to stop the foreclosure. The complaint alleged that the Tylers engaged in "fraud and deceit" and "fraudulent inducement" in causing the Debtor to sign the deeds and the promissory note.
On June 15, 1994, the Appellant filed an answer and counterclaim to the Debtor's state court complaint. Paragraph 11 of this answer acknowledged that the Debtor had terminated the joint venture. On June 17, 1994, the Debtor filed a complaint in Connecticut, alleging charges similar to those brought in the Rhode Island action.
In June 1994, the Order's task force decided to pursue a proposal to sell the *772 excess acreage of the property to Dr. Arcidi. Father Reilly contacted the Debtor and requested that he advise the Order with respect to the sale of the excess acreage. The Debtor agreed to act as an unpaid consultant. In April 1995, the Order and Dr. Arcidi jointly executed an "Offer to Purchase" agreement. Dr. Arcidi did not exercise his rights under this agreement.
When the agreement with Dr. Arcidi did not yield any results, the Order and the Debtor entered into an agreement entitled "Agreement To Purchase." In this agreement, the Debtor, doing business as Aequus Enterprises, was granted a one-year option to acquire the entire property, not just the excess acreage, for $3,200,000.00. The parties did not believe that the Debtor would exercise the option for his own benefit.
On January 16, 1996, the Debtor, with his wife, filed a joint Chapter 11 petition and listed the option as an executory contract on Schedule G. The Debtor did not exercise the option, however, he did locate an entity which purchased the property. On June 2, 1997, the Order sold the property to Turner Hill Preservation Associates, LLC for $4,511,000.00. The Order then paid the Debtor $1,311,000.00. Father Kuczynski testified that he paid the Debtor for services rendered to the Order, and the community, and for his assistance in preparing the property for sale. Father Kuczynski also acknowledged that the Debtor cured certain water and sewer problems on the property.
On June 5, 1996, the Appellant filed an original Proof of Claim, based upon the joint venture, for an undetermined amount. On December 1, 1998, the Appellant amended the claim to reflect the amount owed as $377,750.00

ISSUES
The Appellant alleges numerous deficiencies in the Bankruptcy Court's decision, however, the ultimate issue raised is: Whether the Bankruptcy Court erred in sustaining the Trustee's objection to James W. Sherman's claim and denying it. Since the Bankruptcy Court's determination that the burden of proof to establish the validity of the claim had shifted to the Appellant and its finding, based upon the evidence presented, that the Appellant did not meet this burden were not in error, this Panel affirms.

STANDARDS OF REVIEW
Pursuant to Bankruptcy Rule 8013 and the case law thereunder, questions of law are subject to de novo review. This standard affords no deference to a trial court's determination. "A de novo review allows us to decide the issue as if no decision had been previously rendered (citations omitted). No deference is given to the Bankruptcy Court's decision." In re Miner, 229 B.R. 561, 565 (2d Cir. BAP 1999).
In contrast, findings of fact are subject to a clearly erroneous standard. This standard affords great deference to a trial court's determination.
A finding of fact is clearly erroneous within the meaning of Rule 8013 . . . when "although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made." (citation omitted) While the trial court's findings of fact are not conclusive on appeal, the party that seeks to overturn them bears a heavy burden. (citation omitted). "To be clearly erroneous, a decision must strike [us] as more than just maybe or probably wrong; it must . . . strike [us] as wrong with the force of a five-week-old, unrefrigerated dead fish." (citation omitted). Id.
The issues raised by the Appellant include legal and factual components. When mixed questions are raised on appeal, they are presumptively subject to de novo review. In re Bammer, 131 F.3d 788 (9th Cir.1997). Due to the hybrid nature *773 of the issues presently raised each of these standards are implicated.
The Bankruptcy Court's determinations, that the burden of proof had shifted to the Appellant and finding that he did not meet his burden, thereby denying the claim were not in error.
In its decision, the Bankruptcy Court found that the burden of proof shifted to the Appellant to establish the validity of his claim and that he simply did not meet his burden. The Appellant contends that this finding is in error. This Panel disagrees.
A properly executed and filed proof of claim constitutes prima facie evidence of the validity of the claim. See Fed. R. Bankr.P. 3001(f). To overcome this prima facie evidence, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim. In re Allegheny Int'l, Inc., 954 F.2d 167 (3d Cir.1992). See also In re Giordano, 234 B.R. 645, 650 (Bankr.E.D.Pa.1999).
To refute the allegations of the Appellant that a joint venture existed and continued until the time the property was sold, the Appellee presented testimony of the Debtor, Father Kuczynski and Father Reilly. The Bankruptcy Court after trial, found as a matter of fact that the Appellee had overcome the presumption. It cannot be said that the Bankruptcy Court was clearly in error. The Bankruptcy Court, as the trier of fact, is in the best position to determine the credibility of witnesses and their testimony. The Bankruptcy Court found that the testimony of the Debtor, Father Reilly and Father Kuczynski, presented by the Appellee was of sufficient weight and reliability to shift the burden to the Appellant.
The Appellant offers absolutely no evidence to counter this determination. The Appellant faces formidable obstacles in attempting to contravene the factual determination of the trial court. In re Miner, 229 B.R. at 565. Yet the only evidence produced by the Appellant is his argument that because the Bankruptcy Court found that a loose joint venture had existed then the court must have found that the testimony offered by the Appellee lacked credibility. However, the Appellant's interpretations and speculations are not of sufficient magnitude to compel this Panel to disturb the determination of the Bankruptcy Court.
Once the Appellee offered the evidence refuting the allegations in the proof of claim, the burden shifted to the Appellant. The ultimate burden always rests with the claimant. "(O)nce the presumption is overcome, the ultimate burden to establish the validity of a claim is placed on the creditor." Fed. Bank. R.P. 3001(f) Adv. Comm. Notes. See also In re Barclay Bros. Inc., 1986 WL 15884, *1 (Bankr. E.D.Pa.1986) ("[U]pon the filing of objections, the trustee is then called upon to produce evidence that must be of a probative force equal to that of the allegations of the creditor's proof of claim. While the burden of ultimate persuasion is always on the claimant . . ." (citation omitted.)); In re Circle J Dairy, 92 B.R. 832, 833 (Bankr. W.D.Ark.1988) ("Under [Bankruptcy Rule 3001(f)] a party correctly filing a proof of claim is deemed to have established a prima facie case against the Debtor's assets. (citation omitted.) . . . If, however, evidence rebutting the claim is brought forth, then the claimant must produce additional evidence to `prove the validity of the claim by a preponderance of the evidence.' The ultimate burden of proof always rests upon the claimant . . ." (citations omitted)); In re Williams, 1994 WL 329328, *2 (Bankr. S.D.Ga.1994) ("The objecting party must produce evidence equal to the probative value of the proof of claim itself. (citation omitted). Although the burden of persuasion shifts, the burden of proof always rests upon the claimant."). Agreeing that the burden of proof had shifted to the Appellant, this Panel further determines the Bankruptcy Court's finding that the *774 Appellant had not met this burden was not in error.
A. The Appellant did not establish its claims for breach of the joint venture agreement, breach of fiduciary duty, fraud and deceit.
It was incumbent upon the Appellant to demonstrate that the joint venture existed until the time when the property was sold, because a breach of the fiduciary duty could only occur while the joint venture existed. Meinhard v. Salmon, 249 N.Y. 458, 462, 164 N.E. 545 (1928). There was no written agreement dictating the terms of the joint venture, therefore, the Bankruptcy Court had to look to the state of affairs as they existed and determine if and when the joint venture ceased. It is within the province of a court to determine if, and when, a joint venture has been terminated. Electronic Assoc., Inc. v. Automatic Equip. Dev. Corp., 185 Conn. 31, 440 A.2d 249 (1981) (citing Sime v. A.B. Malouf, et al., 95 Cal.App.2d 82, 212 P.2d 946 (1949)). The Bankruptcy Court, acting within its authority, determined that the joint venture had ceased prior to the sale of the land at issue and this Panel does not disagree.
There is ample evidence in the record to support the Bankruptcy Court's determination that the joint venture had terminated several years prior to the sale of the land. The parties were embroiled in bitterly contested litigation involving allegations of fraud and deceit. The Debtor had also indicated his unwillingness to continue dealings with the Tylers. The trust among the parties had been destroyed as had the joint venture.
It must be noted that the Appellant failed to produce any evidence refuting this determination. The Appellant did not produce any witnesses, including the Tylers, to support his contention that the joint venture continued. In addition, the Appellant had conceded in his Answer in the Rhode Island state court action that the joint venture had been terminated in "late summer/early fall of 1993." (Appellant's Appendix p. 117.) Finally, the Appellant wrote a letter that the Bankruptcy Court found to be the Appellant's acceptance that the joint venture had ended. The letter written by the Appellant and analyzed by the Bankruptcy Court discusses the Debtor removing himself from a different project and the consequences of this withdrawal. In addition, the last paragraph of this letter states, "If there is anything that I can help you with in moving the Ipswich project forward, please call." (Appellant's Appendix p. 110.)
The Bankruptcy Court's determination that the Debtor specifically advised the Appellant of his withdrawal and that the letter can be construed as the Appellant's acceptance that the joint venture was at an end is not clearly erroneous. This letter may be subject to varying interpretations. Anderson v. City of Bessemer, 470 U.S. 564, 572, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (The clearly erroneous standard "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently."), Oklahoma Nat. Gas Co. v. Mahan & Rowsey, 786 F.2d 1004, 1005 (10th Cir.1986) ("The Appellate Court is not to determine whether the trial court reached the correct decision, but rather is to determine whether it reached a permissible one in light of the evidence."). However, based upon the entire record this Panel is not left with the "firm and definite conviction that a mistake has been made." In re Miner, 229 B.R. at 565. This is especially true when, as discussed above, it has been established that the Appellant conceded the termination of the joint venture in a court pleading.
As will be discussed, the fact that the joint venture was terminated well before the sale of the land at issue undercuts the remainder of the Appellant's arguments.
*775 B. The Appellant failed to establish that a party to this joint venture could not unilaterally terminate it and deal with the subject matter or that the sale of the property came about as a result of the activities of the joint venture.
The rights and responsibilities of a party with respect to withdrawing from a joint venture depend upon the nature of the joint venture. "Whether a party has the right to withdraw from it, and what the effect of such withdrawal will be, depends upon the terms of the agreement and upon the circumstances. (citation omitted)." 46 Am.Jur.2d Joint Ventures § 31 (1994). If the agreement does not establish a defined period of time or a particular undertaking then any party to the joint venture can terminate the agreement at any time. Lind v. Webber, 36 Nev. 623, 134 P. 461 (1913).
The Bankruptcy Court found a "loose joint venture" had been established. In re Reilly, 235 B.R. at 243. However, there was no writing to memorialize the agreement. Therefore, it was incumbent upon the Appellant to establish that the agreement was for a fixed time or specific undertaking. He did not. Therefore, this venture must be viewed as an at-will arrangement that any party could withdraw from at any time. This is precisely what the Debtor did.
The Appellant is correct in contending that after withdrawal from the joint venture the Debtor was not at liberty to usurp an opportunity that had come to him through the joint venture. Lind v. Webber, 134 P. at 461. However, the Bankruptcy Court specifically found that the sale of the land "did not come about as a result of the activities of the joint venture during its existence." In re Reilly, 235 B.R. at 244, and listed several valid reasons for this determination. These include: (1) the credible testimony by representatives of the Order that the Order did not decide to sell the entire parcel of property until two years after the Appellant had offered his proposal; (2) the lack of involvement between the Appellant and the Order's task force since October 1993; and (3) the sale of the land did not occur until 1997, some three years after the termination of the joint venture. Id.
The Bankruptcy Court's determination is supported by the record. The evidence indicates that the last time the Appellant had any direct contact with the task force was in January 1994. In September 1993, he presented the task force with a proposal to sell the entire property. This proposal was soundly rejected. In January 1994, the task force advised the Appellant that it was not going to consider selling the property. Id. at 241. The property was sold in June 1997, three and one-half years after the Order rejected the Appellant's proposal. In addition, during this three plus years the parties were engaged in rancorous litigation and the Order had attempted to sell the property to a third party stranger.
This Panel finds that the determination by the Bankruptcy Court that the sale of the property did not come about because of activities of the joint venture is supported by the record. The joint venture had ended and the Debtor did not usurp an opportunity that was derived from the activities of the joint venture. Therefore, the Debtor, alone, could negotiate with the Order with respect to the subject property. Electronic Assoc., Inc. v. Automatic Equipment Development Corp., 185 Conn. at 35, 440 A.2d 249.
In addition, there is a body of law indicating that the rejection of a bid terminates a joint venture and allows the parties to the venture to negotiate with respect to the subject of the joint venture. Electrical Contractors, Inc. v. Goldberg & O'Brien Elec. Co., 29 Ill.App.3d 819, 823, 331 N.E.2d 238 (1st Dist.1975) (Two electrical contractors entered into a joint venture for bidding a job. Where bid was rejected, the rejection terminated the joint venture and parties were free to negotiate for the *776 subcontract.); Marmis v. Solot Co., 117 Ariz. 499, 503, 573 P.2d 899 (App.2d Div. 1977)(Once a prospective purchaser's initial offer was rejected, the joint venture also terminated and all fiduciary obligations between the parties ended.).
Here there is an undisputed finding that the Appellant had offered a proposal to the religious Order and the Order's reaction to the proposal was "unanimously negative." In re Reilly, 235 B.R. at 241. Therefore, under several theories, the Debtor was free to terminate the joint venture and assist the Order in finding a purchaser for the property.
C. The Appellant failed to establish that the Debtor committed tortious interference in the business relationship between the Appellant and the Order.
Once again reviewing the limited evidence presented by the Appellant to support his claims, the only evidence of tortious interference presented was his testimony that the Debtor separated the Tylers and the Appellant from the Order, in general, and Father Reilly, in particular. The Appellant's testimony alleged that the Debtor accomplished this schism by discussing the tension and bickering between the parties with his brother, Father Reilly. His testimony follows:
Q. All right. Directing your attention again to page 9. You have a third counterclaim based on tortious interference?
A. Yes.
Q. Can you tell me what you believe  no. Strike that. Tell me what you know Pat Reilly did between September 24, 1993 and June 15, 1994 to interfere with any relationship between you and your  or the joint venture in La Salettes?
A. Just what I've stated on the  earlier. That he separated us from the person who had absolute control over the furtherance of the development and the sale that we've been working on for a number of years.
Q. So your testimony is that what you understand Pat Reilly to have done constitutes a tortious interference with whatever relationship you had with the La Salettes was some time between September of 1993 and June 15th 1994, he let his brother, Father Tom Reilly, know that there was tension between Pat Reilly and the Tylers?
A. No. It's more than that. We were cut out. We were supposed to have the matter completed by June of  June of 1994, as of the chapter meeting, I believe it was called, and the steps followed right along our plan. I think the last mass was held in June 1995, I believe, and Pat Reilly was given a contract at that time . . . (Appellant's Appendix pp. 241  242.)
This uncorroborated testimony was the only evidence provided to support the claim of tortious interference. The Bankruptcy Court determined that this evidence was insufficient to support the claim. This Panel agrees.

Conclusion
Therefore, this Panel affirms the Bankruptcy Court's determination sustaining the trustee's objection and denying the Appellant's claim.
It is so ORDERED.